# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

———————————

DONNA GALLO, et al.,

       Plaintiffs,

vs.

LOS LUNAS PUBLIC SCHOOLS,
an educational body of the STATE
OF NEW MEXICO, the LOS LUNAS
SCHOOL BOARD, the governing
body of the Los Lunas Schools, and
REX HENINGTON, individually and
in his official capacity, and DANNY
BURNETT, individually and in his
official capacity,

       Defendants.

Civil No. 01-640 WPJ/ACT
Consolidated with
01-1316 WPJ/ACT
Consolidated with
Civil No. 02-0529 WPJ/ACT

**MEMORANDUM OPINION AND ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF
DONNA GALLO'S CORRECTED FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

**INTRODUCTION**                                                      4

**BACKGROUND**                                                       5

**I.**     **Fall 2000 Incidents**                                    6

**II.**    **Spring 2000 Incidents:**                                 7

A        Goodman assault incident                                    7

B.       Code Blue Incident                                          8

C.       Columbine Incident                                          9

D.       First EEOC Charge                                          11

E.       SAPP Funds Incident                                        12

F.       May 30 Hearing                                             13

G.       Removal as Grievance Representative                        14

H.       Investigation Into Gallo's Credentials                     14

I.       Administrative Leave With Pay                              17

J.       Recommendation of Dismissal                                17

K.       Gallo's Resignation and Job Search                         17

L.       Allegations of Negative Comments                           18

M.       Second EEOC  Charge                                        19

**DISCUSSION**                                                      20

**I.**     **Legal Standards**                                       20

**II.**    **§1983 (Counts One, Two, and Three)**                    21

                                                                           Page

        A.      Count One - First Amendment                                21

                1.      *Media Communications and Columbine Statement
                        of Concern*                                        22

                2.      *Union Activities*                                 24

                3.      *Adverse Action*                                   25

        B.      Count Two - Fourteenth Amendment Due Process               25

                1.      *Substantive Due Process*                          26

                2.      *Procedural Due Process*                           29

                        a.      Disciplinary  actions                      29
                        b.      Grievance charges                          30
                        c.      Property right in continued employment     31

                3.      *Liberty Interests*                                34

        C.      Count Three - Fourteenth Amendment Equal Protection        35

        D.      Claims Against School Board                                37

III.    **Count Four - Title VII**                                        39

        A.      Tangible Employment Action                                 39

        B.      Hostile Environment Theory                                 40

IV.     **Count Five - Title VII (Retaliation)**                          44

        A.      Protected Activity                                         44

        B.      Adverse Employment Actions                                 45

        C.      Causal Connection                                          48

**CONCLUSION**                                                            49

**INTRODUCTION**

THIS MATTER comes before the Court upon Defendants' Revised Motion for Summary Judgment on Plaintiff Donna Gallo's Corrected First Amended Complaint, filed June 27, 2003 (**Doc. 294**). Having considered all the pleadings, memoranda and other materials submitted by the parties, as well as the applicable law, I find that Defendants' motion will be granted in part and denied in part for the reasons set forth below.

This consolidated case was initially brought separately by Los Lunas High School teachers Donna Gallo ("Gallo"), Nicki Bertenshaw ("Bertenshaw"), Darlene Goodman ("Goodman"), Eileen Montoya ("Montoya") and Barbara Honeycutt ("Honeycutt") against the above-named Defendants. Only Gallo and Bertenshaw remain as plaintiffs.[1]  Gallo is a former teacher at Los Lunas High School ("LLHS").  The chief malefactors in the lawsuit are Defendants Rex Henington ("Henington"), principal of LLHS and Danny Burnett ("Burnett"), Superintendent of Los Lunas Public Schools ("LLPS").  Gallo alleges that these two individuals engaged in abusive conduct toward her because of her gender, that they viewed her acts of free speech as insubordination, and that they responded to actions she took as a member of the teacher's union ("NEA") with unwarranted discipline and reprimands.  Gallo brings Counts One, Two and Three against Defendants under 42 U.S.C. § 1983: First Amendment, Fourteenth Amendment Due Process (Substantive and Procedural, for Property and Liberty Interests), and Fourteenth

---

[1]  Goodman was termed as a plaintiff on March 25, 2003 in Civil No. 01cv1316, which was consolidated with this case. Gallo remains as a plaintiff in that case and is pro se.  Plaintiffs in two other consolidated cases, Montoya and Honeycutt (Civil No. 01-640 and Civil No. 01-1298), were also dismissed.  Defendants have filed a separate motion for summary judgment against Bertenshaw's claims which  is pending. (Doc. 296).

Amendment Equal Protection.  Counts Four and Five allege violations of Title VII, 42 § U.S.C.A.

2000e to 2000e-17 for sexual discrimination (hostile environment) and retaliation.  I eliminate any

discussion concerning Count Six, asserting violations under the Age Discrimination in

Employment Act ("ADEA"), §§29 U.S.C. 621-634, and Count Seven, alleging violations of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., since

these were alleged by Goodman only, who has since been dismissed from the lawsuit.[2]

## BACKGROUND

A narrative account of this case does not come easily.  One reason is that the intertwining

of names and events which justified consolidation of these lawsuits also has the unfortunate effect

of forcing one to "unravel," rather than "read" the factual allegations in the complaint. The other

reason is that the parties have submitted a less than satisfactory motion package, even after

defense counsel was given a second chance to get it right. See Doc. 261.[3] The following are the

---

[2]  Gallo states that she seeks monetary damages against Henington in his individual
capacity only, and injunctive and declaratory relief against him in his official capacity. Complaint,
¶ 6. However, she categorizes all conduct as conduct of "Defendants," and fails to specify
allegations pertaining to conduct of the named entities.  Gallo also persists to the end of the
Complaint to allege claims against "Defendants" which are clearly precluded from being brought
against individuals, e.g., Title VII.  See Discussion, below.

[3]  This case is factually dense. The allegations are based on several separate but parallel
incidents. Defendants' previous summary judgment motion contained a "plethora of facts[,]" with
many of them more than a page long, and with facts "peppered among" legal argument. While
Defendants' present statement of facts contains less argument than before, it is now reduced to
only the bare minimum of facts.  Defendants' briefs give only perfunctory attention to background
information or a chronological organization of the events, which would have helped the Court
develop an understanding of how the facts fit into the context of both parties' positions. Many of
Defendants' statement of facts are still presented in the form of Gallo's contentions.
    The pleading submitted by Gallo only further compounds the difficulty. While *pro se*
parties are afforded more latitude, the Court's tolerance in this case is tested by Gallo's
responsive pleading, which is a jumble of facts (both material and immaterial) and conclusory
allegations, best described as a written form of pressured speech. Many of Gallo's "disputes" of

5

relevant facts lifted from a convoluted factual matrix. They are presented semi-chronologically, and as much as possible, kept within the context of the discrete incidents from which they arise. Where exhibits are duplicates, I refer only to one party's exhibit. As required when addressing summary judgment motions, I view the factual inferences favorably to Gallo as the non-movant. See Hollander v. Sandoz Pharms. Corp., 289 F.3d 1193, 1214 (10th Cir.2002).

As Gallo tells it, her problems with Henington started in the spring of 1999, when Henington raised his voice to her, although Gallo cannot recall the incident which caused him to do so. Gallo recites no other specific problems until around the fall of 2000, when Henington learned that she was being trained to become the grievance representative for the local NEA.

## I.    Fall 2000 Incidents

Gallo contends that during this time, Henington created a hostile environment for her by advertising the sponsor position for the student group, Students Against Destructive Decisions ("SADD"), a position which she held at the time -- yet did not post sponsorships that were held by men. Gallo was awarded the position after an interview. She also claims that Henington treated her group differently by not allowing the SADD students to participate in certain events. Henington denies that the posting of the position had any connection with Gallo's gender.

Gallo accuses Henington of siding with a male teacher, the JROTC instructor, who referred to Gallo as "Mrs. Queen." Gallo had written the JROTC instructor a note objecting to his keeping a student from her "core" class in order for the student to fax documents about an upcoming JROTC event. Gallo complained to Henington that the reference to her as "Mrs.

---

facts are misnomers in that all they do is embellish undisputed facts with Gallo's slant on their implications.

Queen" was discriminatory and derogatory to her gender because the reference could be construed as calling a person a "dyke or a lesbian."[4] The male teacher subsequently apologized. Gallo's assertion that Henington sided with the teacher seems to be based on Henington's comment to Gallo that if he got a letter like the one Gallo wrote, he too would get angry.  Deft's Ex. B at 23.

Gallo contends that Henington's animosity toward her also stemmed from the fact that she filed grievances on behalf of some custodians.  Gallo disputes Defendants' contention that grievances could not be filed on behalf of custodians because they were classified employees.[5]

## II.      Spring 2000 Incidents

A.  Goodman "assault" incident. On March 9, 2001, a confrontation took place in the school parking lot between Henington and Goodman.  See Defts' Ex. I. The confrontation began over the issue of whether Goodman had followed proper procedures for leaving school early. Matters escalated to the point where Goodman subsequently filed criminal charges against Henington, on Gallo's advice.  Gallo submits evidence that on March 19, 2001, she and Bertenshaw filed a formal grievance on behalf of Goodman regarding the parking lot incident, alleging violations of Goodman's rights under the Collective Bargaining Agreement ("CBA") and

---

[4]  The note reads: "Please be considerate. My class is just as important as yours. If [student's name] is needed to help you with your duties, you could have asked for my permission or taken care of these duties on your own time. We are all professional [sic] here and must respect each others [sic] boundaries (classes)!! Please do not let this happen again."  The male teacher wrote back "EXCUSE ME MRS. QUEEN!. . . Dr. Gallo - I did not know you were in charge around here!" Pltff's Ex. 21.

[5]  Defendants cite to an excerpt from the deposition of Bertenshaw, who according to the complaint was Gallo's union representative.  Bertenshaw explained that classified employees cannot be represented by NEA, but that she could "sit and record and help them." Defts' Ex. G at 233.

her rights under the First Amendment. Pltff's Ex. 53. Gallo also served as Goodman's employee

rights representative in Goodman's subsequent assault grievance against Henington.  Gallo recalls

that Henington told her that she "better get [Goodman] to drop this grievance and criminal

charges."  While Henington recalls going to Gallo's classroom around the middle of March, he

states that he did so because Gallo was serving as Goodman's representative in the grievance

charge Goodman filed against Henington, but denies ever threatening Gallo as she alleges. Defts'

Ex. F.[6]  This incident is relevant to Gallo's general allegations that Defendants embarked on

discriminatory and retaliatory conduct because of her role as Goodman's employee rights

representative.

     B.  The "Code Blue" Incident. On April 19, 2001, Goodman collapsed in the high school

hallway as Randy Earwood ("Earwood") from Human Resources ("HR") handed her a letter from

Burnett. The school nurses arrived immediately, police were dispatched to the scene and an

ambulance was called. While the nurses were tending to Goodman, Gallo happened to pass by on

the scene, and became very upset and started to cry.  Defts' Ex. Q.   Gallo got down on the floor

next to Goodman, who was slumped down in a corner, and tried to talk to her. According to one

witness report, a nurse told Gallo to leave because there were already too many people around.

Goodman was eventually taken to the hospital.   Gallo does not dispute what transpired except

---

[6]  The exact date Henington is alleged to have made these remarks to Gallo is not clear.
According to submitted exhibits, Goodman's grievance was filed on March 15, 2001 based on a
March 9th incident.  Pltff's Ex. 53.  Henington recalls visiting Gallo in her classroom "on or about
March 15, 2001. Defts' Ex. F.
     Exhibit 53, attached to Gallo's response, appears to be a copy of the grievance filed by
Gallo on behalf of Goodman. Defendants state that they were never served with a document
marked Exhibit 53.  Thus, the Court considers it only as evidence that such a grievance was filed,
see Defendants' Fact No. 25, and not for any of its content.

for the exact words she said at the time.  According to Defendants, Gallo was heard to say "I told Mr. Burnett this was going to happen. I told him to just leave her alone."  Gallo denied that she made these comments.[7] On April 23, 2001, Burnett issued a Letter of Reprimand based on "written testimony from numerous witnesses" regarding Gallo's behavior at the Code Blue scene. The letter accused Gallo of "hysterical" behavior which hindered the emergency assistance being administered to Goodman,[8] as well as making derogatory or defamatory comments regarding Burnett in public, which violated that part of the CBA proscribing criticism concerning the behavior of an employee or administrator except in a private setting. Defts' Ex. P. Somewhere around the beginning of May, Gallo filed a grievance based on the issuance of the April 23rd Letter of Reprimand (which in turn was based on the "Code Blue" events) alleging violations of her own rights under the CBA.  Pltff's Ex. 34; see also Complaint, ¶ 13.

C.  Columbine Incident.  April 20, 2001, one day following the "Code Blue" events, marked the second anniversary of the Columbine High School shooting.  Gallo testified that on the evening of the April 19th, she received a phone call alerting her to a television news story which had reported that a map had been found of LLHS showing what looked to be strategic areas that were supposed to be bombed. Gallo arrived at school on April 20th to find heightened

---

[7]Gallo submits as evidence a deposition excerpt taken of Geraldine Sanchez, a witness on the scene, who remembered Gallo stating *They* did this to her. *They* did this to her." (emphasis added). Pltff's Ex. 10 at 55.

[8] Gallo omits a response to this fact (No. 36).  I therefore deem it as being undisputed. However, from the mass of "information" provided elsewhere in Gallo's responses, it seems that her primary objection is the characterization of her behavior as "hysterical" because it is a "sexist" and "discriminatory" comment, and because Burnett "doesn't recall . . . using that term for a male employee." Pltff's Statement of Fact No. 36. Burnett's use of the work "hysterical" is in quotes, implying that the phrase came from a witness account.

security measures in place. Bertenshaw handed Gallo a "Statement of Concern," which Gallo then

distributed to teachers for their signatures, using a student aide to run the errand. The Statement

reads as follows:

> *WHY ARE TEACHERS ALWAYS THE LAST TO BE TOLD!!!!*
> 1) *Last year when weapons were found on campus, the entire faculty and staff were promised by this administration that we would be notified the next time there was a threat or safety issue of any kind at the high school.*
> 2) *Our students have been called out of class to be questioned about remarks they have made on the Internet.*
> 3) *Security guards, Central Office personnel, and the police are all over the school ground.*
> 4) *On the Channel 13 television news last night, it was announced that a map of the high school had been found with the words "Kill" on it.*
> *YET . . . . . . TEACHERS HAVE BEEN TOLD NOTHING ABOUT THIS ALERT!  This is a major safety issue.  We deserve to be informed!*

Defts' Ex. J. Parties dispute whether distribution of the Statement interrupted class periods, and

for how long.[9]  Gallo was placed on administrative leave with pay that same day and she

concedes that this leave was not disciplinary in nature. When Gallo returned on May 2nd,

following a conference to discuss her circulation of the "Statement of Concern," she was placed

on a "Performance Documentation Record" ("PDR").  Defts' Ex. L.  According to the complaint,

Henington and Judy Romero ("Romero"), Assistant Superintendent of Schools, attended the

meeting.  Complaint, ¶ 14.[10]

On May 15, 2001, Gallo filed a grievance pertaining to the Columbine incident.  Pltff's Ex.

---

[9] Gallo adamantly objects to the Defendants' use of the words "circulating a petition" to describe her conduct that morning.  Pltff's Ex. 38 at 2-3;  Ex. 4 at 108.  The Court fails to understand the distinction and cannot help but conclude that to the extent there is a distinction, it is petty and trivial and not worthy of any further consideration.

[10] In her own Statement of Facts, Gallo points out that her husband had filed a lawsuit against Romero which was pending at this time. Pltff's Fact No. 10.

62.[11]   Gallo's husband, Juan Ramos, wrote a letter to Burnett on June 7th, indicating that his wife

would be unable to attend a Level Two grievance hearing that was scheduled for June 8, 2001

(ostensibly concerning the Columbine incident grievance). Defts' Ex. O. Ramos' letter also

indicated that Gallo agreed to waive the timeliness requirements imposed by the CBA for such

hearings.  Gallo objects to the fact that she was given less than 24 hours notice of the hearing by

phone message, and that it was held "off contract" time (i.e., summer time). Burnett went ahead

with the meeting and sent Gallo a letter, by certified mail, which contained findings from the

meeting. This letter basically determined, *inter alia*,  that an adequate investigation was conducted

regarding the April 20th ("Columbine") incident, and that Gallo's challenge to the PDR was

essentially moot because it had been rescinded.

On May 24th, Defendant Burnett notified Gallo that he was rescinding the PDR as an

"inappropriate action in response to the Columbine incident of April 20, 2001 in favor of

'disciplinary action' instead."   The notice stated that a pre-determination meeting would be held

on May 30, 2001 for Gallo to respond to charges of violating certain provisions of the CBA, the

employee safety policy, and the faculty handbook. Defts' Ex. 28.  Burnett sent Gallo another

letter, also dated May 24th, in which he notified her that a pre-determination meeting would take

place on May 31, 2001 regarding the charges contained in his April 23rd letter [the Code Blue

incident]. Defts' Ex. 29.[12]

D.   First EEOC Charge.   Gallo filed the first of two EEOC charges on May 20, 2001,

---

[11]   The exhibit appears to be a copy of a completed "Level One" grievance form.
Defendants state they have no document marked Exhibit 62. Reply, ¶ 14.

[12]   There is no other reference to this May 31st meeting.  However, the topic of the "Code
Blue" incident *was* addressed at the May 30th meeting, along with the "Columbine incident."

alleging hostile work environment and retaliation caused by her being placed on administrative leave and on a PDR.[13]

      E.   <u>SADD Funds Incident</u>.  On May 12, 2001, the SADD group held a car wash. In her deposition, Gallo stated that car wash was held to raise money for Goodman who had medical problems and was in financial need. Ex. 4 at 189. On May 15th, Ms. Jones, a Financial Specialist at LLHS, sent Gallo a memo requesting that the funds received from the event be deposited within 24 hours.[14]  That same day, Gallo shot a memo back to Ms. Jones which stated:

> *I am in receipt of your memo, dated may 15, 2001. The tone of your memo implies that I have done something illegal with the funds.*
>
> *In late April of this year, FFA[15] had a car wash. The FFA participants have informed me that the funds were never turned into the sponsor. The students used the funds for spend [sic] money at their national competition.*
>
> *Did the FFA sponsor receive a similar memo? If not, I view this as unequal treatment, harassment and defamation of my character and professionalism.*
>
> *Be advised that this matter will be forwarded to my attorney for immediate attention. I will also be in contact with Mr. Moffat informing him of your arbitrary policy of allowing some activities to keep fundraising monies, while inferring that I am violating state laws.*

Defts' Ex. S.  Funds from the car wash were deposited by a "Ms. Barber" on May 16, 2001.

---

[13]   As early as this first grievance, if not before, Gallo was creating a record of sorts by copying her attorney at the time, Hannah Best, Esq., with every document she generated.

[14]   The memo reads: "It is my understanding that you had a **SADD** car wash on Saturday May 12, 2001. As of this time there has not been any money deposited into your SADD activity account. **It is imperative that these be deposited immediately.**" (emphasis supplied in the original).

[15]   Although Gallo does not specify what "FFA" is, it is the Court's guess that it refers to Future Farmers of America or some other school-based activity.

In a memo dated May 24, 2001 from William Moffat, Associate Superintendent of Finance (and copied to Burnett),  Gallo received a written reprimand for her insubordination for "not following reasonable request and providing an unsatisfactory written reasonable response to a request by a school business official working in accordance with State regulations." Defts' Ex. T.[16]  The memo explained the basis for the state regulation required immediate deposit of school funds and voiced a concern over Gallo's letter implying a misuse of such funds by the school.

F.   May 30th hearing. A portion of the transcript hearing submitted by Gallo as evidence (Ex. 38) indicates that the three major incidents ("Code Blue," "Columbine" and "SADD funds") were topics at the meeting.  It appears that Burnett was at this meeting.  According to Gallo's statements at this meeting, immediately following the events of "Columbine" incident, Romero and Henington ushered both Gallo and Bertenshaw into the principal's office and informed them that each needed a NEA representative present.  When they each selected the other as representative, Henington responded with a "baffled look on his face." Ex. 38 at 9. Gallo made statements at this meeting concerning her view of what happened during and after the Code Blue and SADD funds incidents.  Gallo stated that Burnett did not conduct an adequate investigation in order to verify allegations that Gallo had made derogatory or defamatory statements about him during the Code Blue incident, and that failure to do so denied her due process. Ex. 38 at 12. Regarding the SADD funds,  Gallo maintained that she knew nothing about the car wash. Ex. 38 at 17.

On June 6, 2001, Burnett issued two letters of reprimand ("Disciplinary Action"),

---

[16]  The memo refers to a pre-determination hearing on the matter which took place on May 23, 2001 attended by Gallo, Julie Castillo, who was head of Personnel at the time, and Mr. Moffat.

addressing Gallo's conduct during the "Code Blue" and "Columbine" incidents.  Pltff's Ex. 30.  In the former, Burnett charged Gallo with making derogatory and defamatory statements against him, in violation of the CBA. The reprimand would be placed in Gallo's file, and she was directed to cease from further conduct of that kind.  In the letter regarding the charges arising from the Columbine incident, Burnett informed Gallo that her violations of the employee safety policy, the faculty handbook, the CBA and the "FERPA student rights," warranted grounds for termination. Burnett stated that he was selecting a letter of reprimand instead of dismissal, given Gallo's "employment history with Los Lunas Schools," but that any "future violations. . . will result in disciplinary action, including possible termination of employment."

G. <u>Removal as Grievance Representative</u>.  On June 1, 2001, Sharon Morgan, President of the local NEA, wrote Gallo advising her that she was removed as grievance representative.  The letter did not state the reasons for the removal.  Gallo offers one - that she and Morgan "shared different philosophies on union representation and appeasement of male administrators." Pltff's Fact No. 41.  Gallo attributes the removal to Morgan's attempt to preserve the collective bargaining process which was then under political fire.  Gallo stated that a "comment" was made (without saying who made the comment) that the Los Lunas School Board (the "Board") would "never forgive" her and Goodman for "going to the media."  Gallo's take on her removal – based on second party hearsay –  is that in an effort to appease the Board, Morgan chose Gallo and Goodman as "sacrificial lambs" for the purpose of preserving the CBA which was being re-negotiated at the time.  Pltff's Ex. 4 at 325.

H. <u>Investigation into Gallo's credentials</u>.  The month of July of 2001 launched the beginning of an inquiry into whether Gallo had falsified her professional credentials.  According to

14

the undisputed background information underlying these events, Gallo's application for employment at LLHS indicated that she had both an M.A. and a "P.D." from Hunter College in New York. Gallo's transcripts indicate that she had earned some 30 hours beyond a Masters Degree, and that she had been awarded an "Advanced Certificate" in Administration and Supervision. Defts' Ex. C.   Gallo does not assert that she has a Ph.D. However, Gallo maintains that when she was first hired in 1997, she was told by Julie Castillo ("Castillo"), head of personnel at LLHS, that her "P.D." degree was equivalent to a Ph.D., which was then factored into Gallo's pay grade.[17] Each year that Gallo was employed by LLHS -- from 1997 up until July 2001 -- she was paid at a Ph.D. or Doctorate level. Pltff's Ex. 14.

On July 6, 2001,  Earwood, the HR Coordinator at that time, sent Gallo a certified letter in which he informed her that in the process of a recent internal audit of personnel files, it was discovered that her file was missing an official transcript which indicated her doctorate degree, and requested that Gallo provide the same. Pltff's Ex. 42.  Gallo responded by letter on July 16th, advising him of what Castillo had told her when she was first hired.  Pltff's Ex. 42. In the letter, she also reminded Earwood that her salary schedule at the Ph.D. level had been verified by the HR department. Pltff's Ex. 17. On August 2, 2001, Gallo amended the EEOC charge which was filed in May to include "I believe I am being further retaliated against because I filed my most recent EEOC charge."  Defts' Ex. X.

The subject of Gallo's credentials came up again in a letter written August 31st by an insurance adjuster named Joel Gross ("Gross"), who worked for the claims management company

---

[17] Gallo recalls that she accepted Castillo's statement because she was new to New Mexico, and was aware of "how substandard the education is in the State of New Mexico. . . ." Defts' Ex. D at 135:1-22.

that handled such claims brought against the school district.  The letter, directed to the law firm Simons, Cuddy, Hetherington, et al., alerted the firm to an inconsistency between the Ph.D. indicated in Gallo's contract with the school and the actual degree (the "P.D." degree) Gallo received from Hunter College.  Defts' Ex. Z. Gross stated that he was interested enough to follow up with a phone call to Hunter College, which resulted in the information that Hunter College did not offer a Doctorate program, and that Gallo had received a Masters Degree and an Advanced Certificate, but not a Ph.D.[18]

The "falsification of credentials" issue becomes even more intriguing by the fact that in Castillo's affidavit, she denied making any representations to Gallo concerning the equivalency of Gallo's "P.D." degree to a Doctorate degree. Further, Castillo states that Gallo told her she had a Ph.D., "which of course is why we all addressed her as 'Dr.'" Defts' Ex. BB.[19] The record contains evidence that Gallo preferred to go by the title of "Dr.": Ex. 2 at 229:18-19; Defts' Ex. O; Pltff's Ex. 48.[20]

_____

[18] Gross stated that he was "interested" because he had friends who graduated from the City University of New York, which includes Hunter College. Gallo characterizes Gross' claim that he phoned Hunter College for information on Gallo's credentials as a "blatant lie" because such information is not released without written authorization. Resp. to Defts' Fact No. 43; Pltff's Ex. 41.

[19]  According to Defendants' statement of the facts, the insurance adjustor's inquiry prompted the investigation, to which Gallo responded by letter. Defts' Fact 43.  The Court is somewhat bewildered at this prospect, since Gallo's letter of response was written more than one month *before* the adjuster's letter and since it is very clear from the language of Gallo's letter that she was responding to Earwood, and *not* the adjuster. Defendants' statement of facts omits any reference to Earwood's letter to Gallo. In their reply, Defendants object to Gallo's reference to Ex. 42 (Earwood's letter), although the basis of their objection is not clear.

Castillo stated that she first learned about the possibility that Gallo falsified her credentials when Gross contacted her in the summer of 2001, and also makes no reference to the letter written in July by Earwood, who apparently was her successor at the HR Department.

[20] Gallo considers this affidavit, supplied by Patricia Torres during the EEOC charge investigation, as "elicited from Henington."  However, other than the handwritten "Rec. 7-27-01 Rex Henington," there is no indication or evidence to support that notion.

I. <u>Administrative Leave With Pay</u>.  By letter of August 6, 2001, Burnett notified Gallo that she was being placed on paid administrative leave pending a pre-determination hearing set for August 13th. Defts' Ex. CC.  Gallo was told she would have an opportunity at that time to respond to charges that she violated contractual provisions which required a teacher to furnish an official transcript of his or her education record and training.

Gallo did not attend this meeting. The only "dispute" Gallo has with this fact is her explanation that her lawyer could not attend the hearing on the 13th, and that Defendants refused to reschedule to accommodate her lawyer's schedule.

J. <u>Recommendation of Dismissal</u>. Burnett issued a Notice of Intent to Recommend Discharge on August 27, 2001, which announced a finding that Gallo had been "mistakenly placed" on the salary schedule for Ph.D. as a result of an "error on a contract request document." Defts' Ex. DD. The letter went on to state that Gallo chose to "perpetuate the misidentification of [her] professional status," based on her repeated usage of the designation "Dr." and "Ph.D." and that this amounted to fraud, misrepresentation of professional status, impropriety and dishonesty, as well as violations of various codes of ethics and "state law." In addition, it was noted that Gallo's conduct in failing to appear in Castillo's office "as directed while on paid administrative leave," constituted insubordination. Burnett advised Gallo that he would be recommending Gallo's dismissal to the Board, as well as recommending the requirement of restitution for overpayment of wages and benefits, and the revocation of her license.

K. <u>Gallo's resignation and job search</u>.  Gallo concedes that she began looking for other teaching jobs in July, and was being paid by the Bernalillo Public Schools by at least the third week in August 2001. Gallo signed a contract with Bernalillo Public Schools on September 1, 2001.  Defts' Ex. EE.  Gallo sent a letter to Burnett dated September 13, 2001 in which she

stated that she was "forced to resign . . . effective September 10, 2001," because of Burnett's "blatant disregard" for her "civil and constitutional rights" due to her gender.  Defts' Ex. FF.

      L.  <u>Allegations of negative comments</u>.   Gallo contends, with no factual support, that Burnett and Earwood attempted to have her fired from her new job at the Bernalillo Public Schools by asking School Superintendent Gary Dwyer ("Dwyer") whether Gallo was using the title "Doctor." In his deposition, Burnett admitted to making the inquiry in order to "see if [Gallo] was perpetuating the fraud," Pltff's Ex. 2 at 229: 12-17, but denies that he ever intended to get Gallo fired from her new job. Pltff's Ex. 2 at 230: 20-23. Gallo also alleges that both Defendants told Dwyer that she was "immoral and unethical." Both Defendants deny this accusation.  Ex. 2 at 227-28: 23-25, 1-3; Defts' Ex. JJ. Dwyer recalled receiving a phone call from Burnett, who was seeking to confirm that Gallo was in fact employed with the Bernalillo Public Schools.  It was Dwyer's understanding from this conversation that Gallo had signed a contract with LLHS for the 2000-2001 school year, and had not advised LLHS that she had taken employment elsewhere. Dwyer stated that Burnett did not refer to Gallo as "immoral or unethical." Defts' Ex. II.

      Part of Gallo's contentions within this category is an evaluation completed by Castillo which Gallo believes impugns her reputation, and is tantamount to accusing her of being "immoral and unethical." Pltff's Ex. 47.  Gallo obtained this would-be evaluation by hiring a service to contact LLHS to see what kind of reference would be provided. Pltff's Ex. 47.  Under "strongest skills" in this hypothetical evaluation, Castillo remarked that Gallo "works very well with the students" and that she has a "very good rapport with kids." She also noted that Gallo needed supervision in certain areas of performance, and that there were complaints or "internal investigations" which resulted in disciplinary action, although Castillo declined to comment on them. On performance areas such as professional conduct, knowledge of job responsibilities, time

management, oral and written communication skills, quality of work, Gallo was rated at 3 to 4 on

a scale of 1 to 5 (5 being "excellent"). Gallo's main objection to the evaluation is a rating of 2 to 3

for the "work ethic and moral integrity" performance area.

Gallo also states that Henington told Castillo, who told Goodman, who in turn finally told

Gallo, that she had falsified her credentials. Defts' Ex. 2 at 314. Other than the obvious hearsay

defect of this statement,[21] it adds nothing to the already factually replete falsification of credentials

issue.

M. <u>Second EEOC charge</u>. Gallo filed a second EEOC charge on November 12, 2001.

Included in this charge were allegations relating to the falsification of credentials issue and

retaliation for filing the first EEOC charge. Defts' Ex. GG. Gallo also stated that she was

"forced to resign" because she feared for her life when a co-worker was "mistaken for [Gallo] at

an assembly and dragged out." Defts' Ex. GG.[22] There is no dispute that Goodman was the

individual who was removed from the meeting. Gallo states that she was mistaken for Goodman

at a teachers' meeting during one of the times Gallo was supposed to be on paid administrative

leave, implying that she was the person who was supposed to have been targeted. Resp. to

Defendant's Fact 51; Pltff's Fact 22. However, Gallo's "mistaken identity" theory is not

supported by any evidence in the record. In fact, according to Burnett's testimony cited to by

Gallo, it was no mistake that Goodman (and not Gallo) was escorted off campus by the Los

---

[21]  Only admissible evidence may be considered by a court when ruling on a motion for
summary judgment, such as affidavits made on personal knowledge, depositions, and answers to
interrogatories. <u>See</u> <u>World of Sleep, Inc. v. La-Z-Boy Chair Co.</u>, 756 F.2d 1467, 1474 (10th
Cir.1985). Hearsay testimony, such as fourth-party hearsay presented by Gallo in this instance,
"is not suitable grist for the summary judgment mill." <u>Hardy v. S.F. Phosphates Ltd. Co.</u>, 185
F.3d 1076, 1079 (10th Cir. 1999).

[22]  Parties are silent on the ultimate disposition of Plaintiff's EEOC complaints.

Lunas Police. Burnett had asked Henington to "make sure" Goodman left campus.  In his deposition, Burnett stated that Goodman, who was on administrative leave at the time, was "rude to staff members" and was "blocking the door so people were having trouble getting into the auditorium . . . causing a safety hazard." Pltff's Ex. 2 at 233-34.

## DISCUSSION

### I.    Legal Standards

Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  An issue of material fact is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." Moya v. U.S.A. et al., 35 F.3d 501, 503 (10th Cir. 1994), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). When, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir.1998). To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case.  Bausman v. Interstate Brands Corp.,  252 F.3d 1111 (10th Cir. 2001).

The individual Defendants raise the defense of qualified immunity for claims brought by Plaintiff under 42 U.S.C. § 1983 (First Amendment, Fourteenth Amendment Substantive and Procedural Due Process, Fourteenth Amendment Equal Protection).  The doctrine of qualified immunity not only protects government officials from the costs associated with trial, but also from "the other burdens of litigation," which include "the burdens of broad reaching discovery." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Once a public official raises a qualified immunity

defense, as the individual Defendants have done here,[23] the plaintiff has the burden of coming

forward with sufficient facts to assert a violation of a constitutional right, and of demonstrating

that the law was clearly established at the time of the defendants' actions. Clanton v. Cooper, 129

F.3d 1147 (10th Cir.1997) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). Once the plaintiff

meets this twofold burden, the public official then assumes the usual summary judgment movant's

burden of showing that there are no genuine issues of material fact and that he or she is entitled to

judgment as a matter of law. Hinton v. City of Elwood, Kan., 997 F.2d 774, 779 (10th Cir. 1993)

(cited in Howard v. Dickerson, 34 F.3d 978 (10th Cir. 1994); Fed.R.Civ.P. 56(c). Specifically, the

public official must show that no material issues of fact remain as to whether his or her actions

were "objectively reasonable" in light of the law and the information he or she possessed at the

time. Id.[24]

**II.      § 1983 Claims (Counts One, Two and Three)**

A.      Count One - First Amendment

A governmental entity cannot condition public employment on a basis that infringes the

employee's protected interest in freedom of expression. Connick v. Myers, 461 U.S. 138, 142

(1983); Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811

---

[23] Qualified immunity is not available as a defense to a governmental entity. Owen v. City of Independence, 445 U.S. 622, 638 (1980); Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2000).

[24] For claims that involve a defendant's state of mind (e.g., intentional discrimination under Title VII), a plaintiff can still survive summary judgment by producing specific evidence of defendant's improper motive, thereby rebutting defendant's assertion of the "objective reasonableness" of the challenged conduct. Lee v. Bd. of County Commissioners of Arapahoe County, Colo.,18 F.Supp. 1143, 1156 (10th Cir. 1998) (citing Lewis v. City of Fort Collins, 903 F.2d 752, 755 (10th Cir.1990)).

(1968). However, this protection extends only to expressions which comment upon matters of public concern. Schuler v. City of Boulder et al., 189 F.3d 1304 (10th Cir. 1999).

To prevail on her First Amendment claim, Gallo must prove that (1) her speech is protected under the First Amendment and (2) the speech was a substantial or motivating factor behind her employer's decision to take adverse action against her. Conaway v. Smith, 853 F.2d 789, 795 (10th Cir.1988), citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  If Gallo meets this burden, Defendants may avoid liability by showing that they would have made the same decision in the absence of the protected activity.  Childers, 676 F.2d at 1341.  Lee v. Bd. of Cty. Commissioners of Arapahoe Cty, Colo et al., 18 F.Supp.2d 1143, 1157 (D.Col. 1998)

In a qualified immunity analysis under a First Amendment theory, the inquiry is whether speech addressed matters of public concern and if so, whether the protected nature of the speech was sufficiently clear that Defendants should have known that the school's interests would not survive a balancing inquiry.  Patrick v. Miller, 953 F.2d 1240, 1246  (10th Cir. 1992). The "speech" alleged by Gallo to be constitutionally protected can be placed within three categories: (i) her "communication" with the media; (ii) the Statement of Concern she circulated during the Columbine incident; and (iii) her union-related activities.

1.    *Media Communications and Columbine Statement of Concern*

Gallo does not describe her "communication" with the media except to say that it was "speech critical of LLHS." Compl. ¶ 12.  This description does not survive the two-part inquiry used to determine whether a public employee's speech warrants constitutional protection under the First Amendment: (1) whether the speech relates to matters of public concern and (2) whether the interests of the public employee in commenting on matters of public concern outweigh the

interest of the government employer "in promoting the efficiency of the public services it performs through its employees." Lee v. Bd. of Cty. Commissioners,18 F.Supp.2d at 1157 (citing Pickering, 391 U.S. at 568 and Connick, 461 U.S. at 146). Speech on a matter of public concern is speech which can "be fairly considered as relating to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. Gallo's "communication" defies analysis, since she provides no description of when the "communication" occurred, nor of the matters disclosed. It is not sufficient that the topic of the speech be of general interest to the public; "in addition, what is actually said must meet the public concern threshold." Schalk v. Gallemore, 906 F.2d 491, 495 (10th Cir.1990).

Inasmuch as the above-mentioned "communication with the media" encompassed the Statement of Concern circulated among the teachers (the "Columbine" incident), it still does not enjoy the protected status of constitutional speech. The Statement was an expression of disagreement over the amount of information Gallo felt teachers should have received prior to LLHS's institution of heightened security measures in response to threats of violence. Although Gallo labels her speech in the Statement of Concern as a concern about safety, the real purpose behind the circulated document was to vent concern over being left out of the information loop ("We deserve to be informed!"). The adequacy of the security measures were not being questioned; indeed, it was the increased security measures which sparked the generation of the document in the first place. Thus, Gallo's concern (as well as that of the other teachers who signed the petition) cannot be characterized as a matter of public concern that exposed evidence of "corruption, impropriety, or other malfeasance" by Defendants. Schuler v. City of Boulder et al., 189 F.3d 1304 (10th Cir. 1999). See Ex. 38, at 4-5. With regard to this speech concerning alleged communications with the media and the Statement of Concern distributed on April 20,

2001, I find that Gallo has not met the threshold requirement in a qualified immunity analysis: the assertion of a constitutional right.  See Saucier v. Katz, 533 U.S. 194, 201 (2001) (If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity).

2.      *Union Activities*

The third category of "speech" presented by Gallo as deserving of First Amendment protection encompasses her union activities. Gallo filed grievances on her own behalf and on behalf of other employees as their grievance representative. At the time Gallo filed these grievances, it was clearly established that the First Amendment protect rights of public employee to join and participate in a labor union. Smith v. Arkansas State Highway Emp., 441 U.S. 463, 465 (1979). Also clearly established was the prohibition against retaliation against an employee who files a grievance with the union. Morfin v.  Albuquerque Public Schools, 906 F.2d 1434, 1439 (10th Cir. 1990). Therefore, Gallo's activities in her role as grievance representative with the union, and the grievances Gallo filed on her own behalf and for other employees, raise a colorable claim under the First Amendment Plaintiff, since she was engaged in what was clearly union activity.

However, I come to a different conclusion regarding Gallo's EEOC complaints, which do not fall in the category of union participation.  In these charges, Gallo alleged that she was subjected to discrimination, harassment and retaliation, which have been treated as purely personal matters. See, David v. City and County of Denver, 101 F.3d 1344, 1356-57 (10th Cir. 1996) (an EEOC charge or internal complaint that does no more than raise an individual employee's grievance is not considered a matter of public concern); Pappas v. Giuliana, 290 F.3d 143 (2d Cir. 2002) ("an EEOC complaint based on race and sex discrimination is not a matter of

public concern, and therefore, is not protected speech").

3.    *Adverse Action*

An adverse employment action is one that alters the employee's compensation, terms, condition, or privileges of employment, or adversely affects her status as an employee. Heno v. Spring/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2000). Deprivations less harsh than dismissal may violate a public employee's rights under the First Amendment. Dill v. City of Edmond, 155 F.3d 1193, 1204-05 (10th Cir.1998) (citing Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990).[25]

I find that sufficient material factual disputes exist concerning remarks Henington allegedly made about getting Goodman to drop her grievance and criminal assault charge against him, the issuance of the letters of reprimand, and the investigation into Gallo's credentials. Viewing the facts in Gallo's favor, both the temporal proximity of the alleged adverse actions, and the circumstances surrounding Henington's statement and the issuance of the letters could give rise to an inference of retaliatory motive. Thus, Defendants are denied qualified immunity on Gallo's First Amendment claim with regard to the grievances Gallo filed with the teachers' union.

B.    Count Two - Fourteenth Amendment Due Process

Gallo alleges violations of both substantive and procedural due process, based on deprivation of her property and liberty interests. "The Due Process Clause not only provides a procedural safeguard against deprivations of life, liberty, and property but also protects substantive aspects of those interests from unconstitutional restrictions by government." Harris v.

---

[25]   Actions of alleged retaliation that do not rise to the level of adverse action under Title VII, may suffice to support a claim under § 1983.  Wells v. Colo. Dept. of Transportation, et al., 325 F.3d 1205, 1220 (10th Cir. 2003); Cf. Schuler v. City of Boulder, 189 F.3d 1304, 1310 (10th Cir.1999) (transfer with same title and job responsibilities is portion of foundation of claim held actionable under First Amendment).

Blake, 798 F.2d 419, 424 (10th Cir.1986).[26]  Gallo's claims fail under both aspects of due process.

1.      *Substantive Due Process*

Gallo's substantive due process claim is based on the loss of her job at LLHS. To prevail on this claim, Gallo must first allege a right entitled to substantive due process protection, and then present evidence such that a reasonable juror could find that Defendants' actions toward her were either arbitrary or capricious, without a rational basis, or in a manner shocking to the conscience. Brenna v. Southern Colo. State College, 589 F.2d 475, 476 (10th Cir 1978); Curtis v. Oklahoma City Pub. Sch. Bd. of Educ., 147 F.3d 1200, 1215 (10th Cir.1998).  Because Defendants have asserted the qualified immunity defense, Gallo must also show that the constitutional right was clearly established at the time such that a reasonable person in Defendants' position would have known that the alleged conduct violated that right." Butler v. City of Prairie City, Kan., 172 F.3d 736, 744 (10th Cir. 1999).

The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity. Gehl Group v. Koby, 63 F.3d 1528, 1538-39 (10th Cir. 1995) (citing Albright v. Oliver, 510 U.S. 266 (1993)). Whether this protection has been, or should be, extended to state-created property interests in employment was unclear in the Tenth Circuit at the time of the underlying incidents, and remains so. Hennigh v. City of Shawnee, 155 F.3d 1249, 1257 (10th Cir. 1998)(circuit precedent does not

---

[26]  In procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law. Parratt v. Taylor, 451 U.S. 527, 537 (1981). Finding that there is a substantive due process right means the right is protected against a government actions regardless of the procedure provided. Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992).

clearly delineate what specific property interests in employment are fundamental, and thus protected by the doctrine of substantive due process); Curtis v. Oklahoma City Public Schools Bd., 147 F. 3d 1200, 1215, n.7 (10th Cir. 1998); Archuleta v. Colorado Dept. of Institutions, 936 F2d 483, 489, n. 6 (10th Cir. 1991) (assuming, without holding, that the plaintiff's property interest would be entitled to the protection of substantive due process).

Other circuit courts are divided on the issue. See e.g., Newmand v. Com. of Mass., 884 F. 2d 19, 25 (1st Cir. 1989) (public employment protected); Gargiul v. Tompkins, 704 F. 2d 661, 668 (2nd Cir. 1983); but see, Huang v. Bd of Governors of Univ. of N. C., 902 F. 2d 1134, 1142, n. 10 (4th Cir. 1990) (public employment not protected); Valot v. Southeast Local School Dist. Bd. of Educ.,107 F. 3d 1220, 1244 (6th Cir. 1997); Brown v. Brienen, 722 F. 2d 360 (7th Cir. 1983) (state-created contract rights should not be reviewed under a substantive due process analysis); Singleton v. Cecil, 176 F. 3d 419, 428 (8th Cir. 1999); McKinney v. Pate, 20 F. 3d 1550 (11th Cir. 1994) (holding that only procedural due process claims are available to pretextually terminated employees). Thus, because Gallo cannot rely on any clearly established weight of authority from other courts in order to allege a viable substantive due process claim, the individual Defendants would be entitled to qualified immunity assuming Gallo's alleged property interest is entitled to substantive due process protections.

The Tenth Circuit has recognized a narrowly carved entitlement to substantive due process in the employment context, in that a tenured public employee is not precluded from substantive due process protection of his or her property interest in his or her continued employment. Tonkavich v. Kansas Bd. of Regents, 159 F.3d 504, 528 (10th Cir. 1998). In the instant case, the word "tenured" is bandied about, particularly by Gallo, without any assertion or evidence that she is in fact tenured. This matters little in the final analysis, since Gallo's claim

27

would fail even if she was tenured.  In light of the numerous events and conflicts among Gallo, Henington and Burnett, Gallo's decision to seek employment elsewhere is not surprising.  It is not, however, constructive discharge, because under the particular facts of this case, no reasonable juror could conclude that Gallo was "compelled to resign" due to intolerable work conditions.  Sanchez v. Denver Public Schools, 164 F.3d 527, 534 (10th Cir.1998) (quoted case omitted); James v. Sears, Roebuck & Co., Inc., 21 F.3d 989, 992 (10th Cir.1994)). The bar in the Tenth Circuit is quite high in constructive discharge cases: a plaintiff must show he or she had no other choice but to quit. Sanchez, 164 F.3d at 534.

The Court's conclusion turns on the factual chronology.  Gallo started looking for work in July of 2001, was being paid by a new employer (Bernalillo Public Schools) by at least the third week in August, and signed a contract of employment by September 1, 2001. Thus, Gallo  had started to "resign" arguably before being place on paid administrative leave on August 6th, before the August 13th pre-determination hearing, and clearly well before Burnett wrote the Notice of Intent to Recommend Dismissal on August 27th. The language regarding restitution for overpayment of wages and benefits, and the specter of possible revocation of Gallo's license could not be part of her motivation to seek other employment, since they did not exist at the time she was receiving another paycheck.

These facts do not support a finding that Defendants' conduct toward Gallo was arbitrary or capricious. See, e.g., Clinger v. N.M. Highlands Univ., et al.,215 F.3d 1162, 1167 (10th Cir. 2000) (assuming that plaintiff had a property interest in continued employment with the university, there was no evidence in the record that the deprivation of that interest was either arbitrary or capricious).  Gallo effectively resigned from her job at LLHS. Thus, all Defendants are entitled to summary judgment on this claim.

2.    *Procedural Due Process*

In Gallo's response, she lists specific actions taken by Defendants which allegedly violated her procedural due process rights. Since Gallo presents these as the "main" deprivations, I will address them within the general category of alleged deprivations liberally construed from the pleadings. At the time these actions occurred, the law was clearly established that a procedural due process claim must be based on a showing that the state deprived the plaintiff of a protected property or liberty interest. Workman v. Jordan, 32 F.3d 475, 479-80 (10th Cir. 1994).

a.   Disciplinary actions.   Gallo alleges that placing her on administrative leave with pay ("suspension"), issuing a PDR (which Gallo conceded was *not* a disciplinary action), and the imposition of disciplinary measures (e.g., letters of reprimand) were violations of her due process rights. None of these actions invade any recognized property interest. See Pitts v. Bd. of Educ of U.S.D. 305, Salina, Kansas, 869 F.2d 555, 556 (10th Cir. 1989) (while suspension of a public employee without pay may infringe upon a property right, two-day suspension *with* pay did not deprive plaintiff of any measurable property interest) (emphasis supplied in original).  Thus, for purposes of procedural due process analysis, it matters little that Gallo received no hearing prior to being issued a PDR or any of the letters of reprimand (including those issued on June 6th), since none of these actions infringed on a property right sufficient to entitle her to due process. The fact that Gallo did get a hearing prior to receiving a letter of reprimand for the Columbine incident did not in and of itself create a property interest, nor is there any evidence that state law provided such a right  Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972) (Property interests are not created by the Constitution, but by "existing rules or understandings that stem from an

independent source such as state law").[27]

      Gallo expresses other "due process deprivations" that are more aptly characterized as objections to the process she did receive, such as Defendants' refusal to divulge the names of teachers who complained of classroom disruption during the "Columbine" incident, and of the student aides who were interrogated. Assuming process was due for these disciplinary acts (which I have already found not to exist), these actions do not violate the minimum requirements of due process, which is "some kind of notice and ... some kind of hearing." Goss v. Lopez, 419 U.S. 565, 579 (1975).  Accordingly, with regard to the imposition of the PDR and letters of reprimand, Gallo's claim of procedural due process violations will be dismissed because she has not demonstrated the violation of a protected interest. See Snyder v. Murray City Corp, 159 F.3d 1227 (10th Cir. 1998) (process is due only when the government terminates a protected interest).

      b. Grievance charges.   Gallo's filing of a grievance changes the contours of her claim under a procedural due process theory.  While grievance procedures do not themselves create a property interest in continued employment, they can "sustain an entitlement to the procedures themselves." Russillo v. Scarborough, 935 F.2d 1167, 1170 (10th Cir. 1991); Hennigh v City of Shawnee et al., 155 F.3d 1249, 1255  (10th Cir. 1998) (recognizing that other circuit courts generally hold that grievance procedures provided by a collective bargaining agreement can satisfy

---

[27] It is undisputed that Gallo received a post-determination hearing which addressed both the "Code Blue" and "Columbine" incidents.  Gallo does not allege that the procedures that were in place at the time were deficient; rather, she contends that they were not made available to her. Thus, even if Gallo was entitled to a hearing before receiving a letter of reprimand, her due process rights were not violated because a post-determination hearing was held.  See McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) (state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under §1983 arise).

a plaintiff's entitlement to post-deprivation due process). This law was clearly established when the underlying incidents occurred. However, because the undisputed facts show that Gallo received all the process that was due, Defendants are entitled to summary judgment on this aspect of the claim as well.

In her response to the summary judgment motion, Gallo states that she did not abandon her grievance claim, but she fails to back up this statement with any evidence. Moreover, Gallo's representation is not consistent with her own prior statements in her deposition, where she stated that she considered the grievance no longer pending once she signed a contract with Bernalillo Public Schools. Since Gallo signed the contract with Bernalillo Public Schools at least a few weeks before resigning from LLHS, she did not allow Defendants to provide the process which she alleges was due. Gallo effectively waived her right to any further due process. See Pitts v. Bd. of Educ of U.S.D. 305, Salina, Kansas, 869 F.2d 555, at 557 (10th Cir. 1989) (failure of a plaintiff to permit a defendant to provide any due process by resigning eliminates the claim).

Similarly, Gallo appears to challenge the due process that was provided on her grievance based on the inadequacy of notice (24 hours) for the June 8th hearing and on the fact that Defendants proceeded with the hearing instead of rescheduling it because Gallo was out of town. In the letter which subsequently followed upon the hearing, Gallo was formally notified that she could proceed to the next grievance level if she was dissatisfied with the decision. Whether or not Gallo followed through with the completion of the grievance procedure, it was her decision to ultimately abandon the process by resigning from her job.

c. Property right in continued employment. As mentioned above, the parties have not adequately briefed the issue of whether Gallo had a property interest in continued employment. In

the interest of expediency, I will proceed on the assumption that she did.[28]

As an individual with a property interest in employment, Gallo would be entitled to "something less" than a full evidentiary hearing prior to adverse administrative action, such as dismissal from employment. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985).  Gallo was informed on August 6th that a hearing was scheduled on August 13th as an "opportunity to respond to the charges" related to Gallo's professional credentials.  Gallo does not dispute this. Her only quibble is that Defendants did not change the date of the hearing so that her lawyer could attend.  The minimum requirements of a pre-termination hearing include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the plaintiff to present her side of the story. See Loudermill at 546; Tonkavich v. Kansas Bd. of Regents, 159 F.3d 504, 517 (10th Cir. 1998).  The right to be represented by counsel is not included at this level of due process. Hennigh v. City of Shawnee,155 F.3d 1249, 159 (10th Cir. 1998) ("Because it is followed by post-termination proceedings, the pre-termination hearing is not meant to resolve definitively the propriety of the discharge, but only to determine whether there are reasonable grounds to believe the charges are true and the action is correct").

In the Notice of Intent to Recommend Dismissal, which followed the August 13th hearing, Gallo was advised that she had a right to a hearing before the Board upon a timely request.  There is no indication that Gallo ever made this request. Under these facts, Defendants did not deny Gallo her rights under due process;  she waived them by not appearing at the meeting and by not

---

[28]   A continued interest in employment could be established by a showing that a plaintiff is tenured, or a by a provision in a policy manual that disallows firing of employees except for "cause." Patrick v. Miller, 953 F.2d  1240, 1245 (10th Cir.1992) (county personnel policy manual stating that employees could not be fired "except for cause or reasons of curtailment of work or lack of funds" conferred "a property interest in continued employment that could not be curtailed without constitutional protections").

requesting a hearing upon receipt of the Notice of Intent to Recommend Dismissal. See, Pitts v. Bd. of Educ of U.S.D. 305, Salina, Kansas, et al., 869 F.2d 555 (10th Cir. 1989) (finding that plaintiff waived due process rights by refusing to take advantage of state's post-termination process). Indeed, by the time she received this Notice, she was already on the payroll of another employer.

Gallo's resignation does not doom her procedural due process claim if she can show that she was constructively discharged, and thus forced to resign. In the year 2000, the law was clearly established that constructive discharge from employment is actionable under § 1983 if an employee possesses a protectable property or liberty interest in employment, i.e., a legitimate expectation in continued employment. Lighton v. Univ. of Utah, 209 F.3d 1213, 1221 (10th Cir. 2000); Parker v. Board of Regents of Tulsa Jr. College, 981 F.2d 1159 (10th Cir. 1992) (where resignation amounts to a constructive discharge, court could find deprivation of property interest without due process). Although Gallo does not explicitly argue constructive discharge as part of her procedural due process claim, this theory does not help her.[29] As discussed above, Gallo has not put forward any facts from which it could be reasonably inferred that her departure from LLHS was coerced and that she was constructively discharged. Nothing prevented Gallo from requesting a hearing before the Board on the issue of Burnett's recommendation.

Gallo voluntarily chose not to take advantage of the due process that was available and offered. Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir.1996) ("An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged"); see also Parker v. Board of Regents of Tulsa Jr. College, 981 F.2d

---

[29]  Defendants correctly note that Gallo pled constructive discharge only in the context of her Title VII claim.  However, I continue to construe Plaintiff's claims liberally due to her *pro se* status.

1159 (10th Cir. 1992) (voluntariness of plaintiff's decision to resign was determinative of whether qualified immunity would bar action). Having chosen that route, Gallo cannot successfully claim that Defendants deprived her of due process regarding her presumed property right in continued employment. See Stone v. Univ. of Md. Med'l System Corp, 855 F.2d 167, 174 (4th Cir. 1988), cited in Parker, 981 F.2d at 1162 (If an employee retires of his own free will, even though prompted to do so by some action of his employer, he is deemed to have relinquished his property interest in his continued employment for the government, and cannot contend that he was deprived of his due process rights).

Summing up all aspects of Gallo's procedural due process claim, after viewing the facts favorably to her, I find that no genuine issues of material fact remain which keep alive Gallo's claim of constructive discharge, and no disputes of fact exist from which a reasonable juror could find that Defendants violated Gallo's due process rights. Therefore, I conclude that Defendants are entitled to summary judgment on Gallo's procedural due process claims.

3.      *Liberty Interests*

Gallo alleges that Defendants violated her liberty interests by damaging her reputation and good name. Injury to reputation alone, however, is not a deprivation of a liberty interest. Siegert v. Gilley, 500 U.S. 226, 233-34 (1991); Paul v. Davis, 424 U.S. 693, 709 (1976). In order to show that Defendants infringed on her liberty interest, Gallo must show (1) that statements were made that impugn the good name, reputation, honor, or integrity of the employee; (2) that the statements must be false; (3) the statements must occur in the course of terminating the employee or must foreclose other employment opportunities; and (4) the statements must be published. These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the  liberty interest. Watson v. Univ. of Utah Med. Ctr., 75 F.3d 569, 578  (10th Cir. 1996) (citations

omitted).

Gallo offers no evidence to support any of these elements.  First, none of the alleged

maligning statements was made in the course of dismissal, since Gallo was never dismissed.

Through Burnett's action, the closest Defendants got to dismissal was in recommending dismissal

to the Board.  Gallo left before any other measures were taken. Second, notwithstanding

allegations that Burnett and Earwood tried to sabotage Gallo's new job -- allegations that have no

evidentiary support at all – her claim collapses because of the fact that she cannot establish that

they stigmatized her chances for employment. See, e.g.,  Siegert v. Gilley, 500 U.S. 226, 233, 111

S.Ct. 1789, 114 L.Ed.2d 277 (1991) (plaintiff's claim failed because allegedly defamatory letter

was not written incident to his termination, since plaintiff voluntarily resigned and letter to

prospective employer was written several weeks later).  Gallo simply cannot show that other

employment opportunities were foreclosed when she obtained employment with the Bernalillo

Public Schools. See Corbitt v. Andersen, 778 F.2d 1471 (10th Cir.1985) (damage to "prospective

employment opportunities" is too intangible to constitute a deprivation of a liberty or property

interest; even if defendants' actions made plaintiff less attractive to employers or clients, that is

insufficient to state a deprivation of a liberty or property interest under § 1983).  Thus,

Defendants are entitled to summary judgment on Gallo's due process claim based on liberty

interests.

C.      Count Three - Fourteenth Amendment Equal Protection

Gallo alleges unequal treatment by Defendants on two bases: (1) that she was disciplined

differently from male teachers with regard to her suspension following the "Columbine" incident,

and (2) that Burnett changed the grievance procedures for Goodman so that they were different

from those used for male employees.

In order to prevail on her Equal Protection claim, Gallo must show that Defendants treated her differently than others "similarly situated" and that this different treatment lacked a rational basis. Landmark Land Co. of Oklahoma v. Buchanan, 874 F.2d 717, 722 (10th Cir.1989). Gallo's reference to a male teacher accused of sexual harassment and who allegedly was not punished does not even come close to a "similarly situated" showing. See, e.g., Hennigh v. City of Shawnee, 155 F.3d 1249, 1257 (10th Cir.1998)  (plaintiff's claim properly dismissed where plaintiff compared himself to employee who was disciplined for failure to report an incident of harassment, rather than the act of harassment).

Gallo also contends she was treated unequally because Burnett changed the grievance procedures for Goodman's grievance so that they were different from those used for male employees.  Gallo has standing to assert only her own constitutional claims and may not assert Goodman's alleged claims.[30]  Notwithstanding the obvious standing issues, Gallo offers no explanation or evidence of what procedures were changed or were somehow different for female employees. Exhibit 55, on which she apparently relies for evidence, consists of two letters addressed to Gallo from Burnett: one dated April 18, 2001 setting the date and time (April 18, 2001 at 4:00) for a Level Two hearing on Goodman's grievance; and the other dated June 6, 2001 setting a meeting on June 8th at 5:30 p.m. "to attempt to resolve the grievance."  Both letters outline rules for the hearing, but indicate nothing out of sorts from what one would reasonably expect, e.g., "Opening and closing statements may be waived by each party, or waived," and "Non-party witnesses are not to be present in the hearing except to give testimony and be cross-

---

[30]  I also point out that as to those grievances filed on behalf of either Goodman or school custodians, Gallo would have no standing to use them as a basis for a claim brought under § 1983.  U.S. v. Raines, 362 U.S. 17, 22 (1960); Cotner v. Campbell, 795 F.2d 900, 902 (10th Cir. 1986) (a litigant may only assert his own constitutional rights or immunities in a § 1983 action).

examined." Gallo's unsupported and conclusory allegations that grievance procedures were unfairly applied to women are insufficient to raise a dispute of material fact on her equal protection claim. Therefore, summary judgment is granted on this claim.

D.     Claims Against the School Board

In her § 1983 claims, Gallo makes generic assertions against all Defendants. However, as government entities, neither the LLPS nor the Board can be held liable for the actions of its employees under a theory of respondeat superior. Monell v. Department of Social Services, 436 U.S. 658, 691 (1978). Instead, it must be shown that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action. Pembaur v. City of Cincinnati, 475 U.S. 469, 480-83 (1986) (plurality opinion); Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2000).

Defendants contend that the Board should be dismissed. As noted above, Gallo does not make specific allegations against any member of the Board, or allegations that the Board participated in discriminatory or retaliatory conduct. Based on my discussion above, Defendants are entitled to summary judgment on all of Gallo's § 1983 claims, which eliminates the possibility of the Board's liability. See Apodaca v. Rio Arriba County Sheriff's Dept., 905 F.2d 1445, 1447 (10th Cir. 1990) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (A municipality may not be held liable where there is no underlying constitutional violation by any of its officers).

Further, Gallo shows no evidence of a connection between any of the alleged illegal actions taken by Henington or Burnett, and the Board. Williams v. City & County of Denver, 99 F.3d 1009, 1020 (10th Cir. 1996) (municipal liability requires existence of causal connection

between the unconstitutional act and the authorized decisionmakers);[31] cmp., Ware, 902 F.2d at 818 (finding that board acted with deliberate indifference to plaintiff's First Amendment rights where evidence showed that board members knew about plaintiff's public stand on bond issue and were informed of her belief that she was being retaliated against).  Even with a finding of material fact as to any of Gallo's § 1983 claims, the Board's liability could only be premised on Henington's or Burnett's conduct if -- and only if -- either individual had final policymaking authority, or if the Board delegated this authority. Not only does Gallo fail to assert anywhere that such delegation existed, but the evidence points to the contrary.  For example, Burnett's final action with regard to Gallo was notice of intent to recommend discharge only. Thus, he could not have final policy or decisionmaking authority over Gallo's employment.  Defts' Ex. DD. Cmp., Ware v. Unified Sch. Distr. No. 492, Butler County, State of Kansas, et al., 902 F.2d 815, 818 (10th Cir. 1990) (finding that school board had not delegated authority where school superintendent's decision to terminate was not cast in term of a policy statement, did not represent custom or usage "with the force of law," and where superintendent's decision was subject to review by board) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 130 (1988)). Burnett's decision to recommend Gallo's dismissal was never before the Board, as the process was aborted by Gallo's decision to leave.

I agree with Defendants that the Board should be dismissed as a party to Plaintiff's §1983 claims. Dismissal of the Board also warrants dismissal of both Henington and Burnett in their official capacities. Kentucky v. Graham, 473 U.S. 159, 165 (1985) (an action filed against a

---

[31] In her deposition, Gallo alludes to the Board not forgiving her for going to the media, Ex. 4 at 325; however, Gallo fails to provide any evidence to minimally support this conclusory allegation.  Gallo also mentions the Board's "policies" that violated her rights, Resp. at 21, without further specifics.

state official in his or her official capacity is simply another way of pleading an action against an entity of which an officer is an agent).

## III.     Count Four - Title VII (Sex Discrimination and Hostile Environment)

Gallo alleges that "Defendants" created a hostile and abusive working environment in violation of Title VII.  Compl., ¶ 47.  Burnett and Henington should not be included as Defendants in this claim, since Title VII applies only to employers. Lankford v City of Hobart, 27 F.3d 477, 480 (10th Cir. 1994). Thus, both these individual Defendants are dismissed from Gallo's Title VII claims.

Hostile environment sexual harassment is actionable under Title VII's prohibition against sex discrimination. Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986). Under Title VII, employers are vicariously liable for hostile environment sexual harassment perpetrated by a supervisor. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998).  The distinction between cases in which the supervisor takes a tangible employment action against the subordinate and those in which he does not replaces the so-called "quid pro quo" harassment and "hostile environment harassment" cases.

A.     Tangible Employment Action

It is not clear whether Gallo alleges that she suffered a tangible employment action, which has been defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington, 524 U.S. at 761. At any rate, none of Defendants' actions had an impact on Gallo's employment that would fall in the category of a tangible employment action: paid administrative leave; PDR (not disciplinary, and was rescinded); removal of Gallo as a grievance representative by a non-Defendant (Sharon Morgan); letters of reprimand;

credential investigation; recommendation for dismissal.  None of these actions had any effect on

Gallo's salary or job responsibilities.  Even the recommendation for dismissal, which was issued

after Gallo already had obtained another teaching position, did not change her existing job

position in any way.

Gallo's claim under a theory of constructive discharge could not proceed because, as I

previously stated, the undisputed facts show that Gallo was not constructively discharged.  See,

e.g., Rubidoux et al v. Colo. Mental Health Inst. At Pueblo et al., 173 F.3d 1291, 1295 (10th Cir.

1999) (summary judgment granted to defendant where plaintiff's discharge was not consequence

of refusing to submit to advances, but rather because she quit).[32]

B.      Hostile Environment Theory

---

[32]  Further, Gallo cannot use her claim of constructive discharge as evidence of a tangible employment action. The law in the Tenth Circuit and in other circuits is unclear whether such a claim, even if viable, could be considered a tangible employment action under Burlington. See, Caridad v. Metro-North Commuter RR, 191 F.3d 283, 294 (2d Cir. 1999) (constructive discharge was not a tangible employment action warranting imposition of strict liability under Ellerth/Faragher standard); Mallinson-Montague et al. v. Pocrnick et al., 224 F.3d 1224 (10th Cir. 2000) (tangible employment action does not need to be severe enough to constitute constructive discharge, but noting that it would be "unwise to merge the Supreme Court's specific language in Faragher and Burlington into the general umbrella concept of 'constructive discharge'") (dicta); Dunegan v. City of Council Grove, Kansas Water Dept., 77 F.Supp.2d 1192, 1199-1200 (D.Kan.1999) (finding "no merit to plaintiff's suggestion that a constructive discharge falls within the definition of 'discharge' as set forth in Ellerth"); Montero v. AGCO Corp., et al., 192 F.3d 856, 891 (9th Cir. 1999) (not deciding the issue of whether a constructive discharge can be a "tangible employment action" for the purpose of a Faragher analysis, because Plaintiff was not constructively discharged); cmp., Bowman v. Shawnee State Univ., 220 F.3d 456, 462 n.6  (6th Cir. 2000) (assuming, without discussion, that constructive discharge was a tangible employment action) with Turner v. Dowbrands, Inc., 221 F.3d 1336 (unpublished opinion), 2000 WL 924599 (6th Cir.(Ohio)) (constructive discharge is not a tangible employment action for purposes of Faragher and Burlington); Wolf v. Northwest Indiana Symphony Society, 250 F.3d 1136, 1142 (7th Cir. 2001) (noting that court had not yet determined whether a constructive discharge is a tangible employment action); but see Phillips v. Taco Bell Corp., 156 F.3d 884, 889 & n. 6 (8th Cir.1998) (allowing constructive discharge claim to proceed as "tangible detrimental employment action," depending upon whether plaintiffs were able to generate a genuine issue of material fact that they were constructively discharged).

A claim based on allegations of sexual harassment involving "unfulfilled threats" where no tangible employment action was taken requires a showing of severe or pervasive conduct. Burlington, 524 U.S. at 754. For this type of hostile environment claim to survive a summary judgment motion, the plaintiff must show that a rational jury could find that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257, 1264 (10th Cir.1998) (quoted case omitted). There is no "mathematically precise test" for determining whether the conduct is sufficiently severe or pervasive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Rather, a court considers "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Cadena v. The Pacesetter Corp., 18 F.Supp.2d 1220, 1226 (D.Kan.1998) (citing Faragher, 524 U.S. at 786). In considering these factors, a court also must consider the context in which the conduct occurred. Id.

The linchpin for hostile environment claims is "whether members of one sex are exposed to disadvantageous terms or conditions to which members of the other sex are not exposed." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998); Stahl v. Sun Microsystems, Inc., 19 F.3d 533, 538 (10th Cir.1994) ("If the nature of an employee's environment, *however unpleasant*, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment") (emphasis added); Penry v. Fed'l Home Loan Bank of Topeka et al., 155 F.3d 1257 (10th Cir. 1998) (finding that few allegations made were due to gender). While the complained-of conduct does not have to be exactly sexual, a female

plaintiff does need to show that female employees were treated less favorably than male employees. See, e.g., Stinnett v. Safeway, Inc., 337 F.3d 1213 (10th Cir. 2003) (evidence on claim that female employees were required to clean underneath checkstands and serve on-call to remote locations, and that male employees obtained extra training, failed to create material dispute as to whether Safeway was permeated with "discriminatory intimidation").

This key element is missing in the instant case. After carefully poring through Gallo's medley of facts and allegations and construing them favorably in her favor where appropriate, I find that no reasonable juror would consider any of Defendants' alleged conduct to have been gender-motivated.  Gallo presents no evidence (other than her own personal opinions) that the paid administrative leaves, the PDR, or the letters of reprimand were meted out with regard to Gallo differently than they were, or would have been, to male teachers.

The same can be said concerning Gallo's other allegations of differential treatment. She accuses Henington of treating female union representatives adversely because he was threatened by them, and that he fought against their obtaining any control over administrative matters. As evidence, Gallo offers Bertenshaw's deposition, which turns out to be third-party hearsay.[33]  Gallo also offers Henington's deposition statements where he responded in the negative to the question of whether he could recall any male union representatives who had disagreed with his management style. Ex. 6 at 82.  From this, Gallo hopes to create the inference that Henington's allegedly harassing conduct toward her was due to her gender. However, the only reasonable inference possible to infer is an animus bred of personality and administrative differences – not

---

[33]  Bertenshaw stated that Montoya told her when she quit that Burnett had told her and the rest of the administrative team that "NEA is not going to take over this school, these women are not going to run this school, we will listen, will go along, we will totally ignore them." Ex. 1 at 215.

one that is gender-based. <u>See</u>, <u>e.g.</u>, <u>Brown v. Henderson</u>, 257 F.3d 246 (2d Cir. 2001) (plaintiff

could not succeed on a sexual harassment claim because the harassment of plaintiff was not based

on plaintiff's gender but was instead motivated by a heated union dispute).

Gallo's allegation that Henington posted the sponsorship for her student group (SADD)

but none of the male-sponsored groups is not supported by any evidence at all, much less that

advertising the position for the SADD group was illegally motivated. Gallo also attributes

Henington's turning down her NEA leave to her being female. Her proffered evidence on this

issue is Exhibit 51, which is a copy of Henington's rejection of her request for leave, and contains

at the bottom of the page Henington's reason for refusal: "Sorry, this would be considered

Professional leave - you have already used Professional. Rex." I do not find that Defendant's

denial of this leave request contains any inference of discriminatory motive, nor does Gallo rebut

Henington's statement that she had in fact used up her professional leave time.

Gallo contends that Burnett's use of the word "hysterical" in the letter or reprimand

relating to the "Code Blue" incident was derogatory. It is clear from the text of the letter itself

that Burnett's reference to Gallo's behavior as "hysterical" was not direct, but was from a

witness' report about the incident. Even if this remark could be considered to be derogatory and

was attributable to Burnett, it is not indicative of intentional discrimination, since it is merely a

reference to how someone else described Gallo's behavior that day. Further, I conclude this

comment cannot be considered either severe or pervasive enough to interfere with Gallo's work

environment.

Summing up Gallo's hostile work environment claim, I find that it lacks one of the

essential ingredients to this type of claim: a showing that any of the conduct or statements were

carried out with gender-based animus. <u>Stahl v. Sun Microsystems, Inc.</u>, 19 F.3d 533, 538 (10th

Cir. 1994) (emphasis added) ("If the nature of an employee's environment, however unpleasant is

not due to her gender, she has not been the victim of sex discrimination as a result of that

environment"). Thus, Defendants are entitled to summary judgment on Gallo's Title VII claim

based on hostile environment.

## IV.    Count Five - Title VII (Retaliation)

Title VII prohibits retaliation because an employee either opposes an unlawful

employment practice, or because that employee participated in protected activity. §42 U.S.C.

2000e-3(a). To establish a prima facie Title VII retaliation claim, a plaintiff must show: (i) that she

was engaged in opposition to Title VII discrimination; (ii) that she was subjected to adverse

employment action subsequent to or contemporaneous with the protected activity; and (iii) that

there is a causal connection between the protected activity and the adverse employment action.

Gunnell v. Utah Valley State College, 152 F.3d 1253, 1262 (10th Cir.1998); Murray v. City of

Sapulpa, 45 F.3d 1417, 1420 (10th Cir.1995). For reasons given below, I find that Gallo has

presented sufficient evidence to preclude summary judgment on all three prongs of a prima facie

case.

A.    Protected Activity

Not all of the activities Gallo engaged in are considered "protected activities" under Title

VII. For example, neither Gallo's circulation of the Statement of Concern during the

"Columbine" incident nor any of her statements during the time Darlene Goodman collapsed in

the hallway (the "Code Blue" incident) are protected activities. However, Gallo's EEOC

complaints and the filing of grievances (i.e., the grievance filed on or about May 2, 2001 for the

April 23rd reprimand for the "Code Blue" incident, and the grievance filed on or about May 15,

2001 pertaining to the "Columbine" incident after Gallo was placed on a PDR and paid

administrative leave) do come under Title VII's protection. Similarly protected would be any informal complaints Gallo made to Burnett concerning alleged violations of Goodman's constitutional rights. The grievance Goodman filed with Gallo as her representative is not protected activity, because Gallo has no standing to assert Goodman's constitutional rights. However, Gallo's role as union representative could possibly transform Goodman's grievance into a kind of "opposition" to retaliation.[34]

Gallo's May 2, 2001 letter to Henington following a discussion regarding placing her on a PDR is also protected activity. Because Gallo refers to Defendants' actions as a denial of her constitutional right to due process and reputation, this conduct may be construed as protected activity. O'Neal v. Ferguson Const. Co., 237 F.3d 1248 (10th Cir. 2001) (an informal complaint to management qualifies as protected activity).

B.     Adverse Employment Actions:

Just as not all of Gallo's activities can be considered "protected activities," not every action taken by Defendants is an "adverse employment action," which adversely affects or unfavorably alters the conditions of an employee's employment. The Tenth Circuit liberally defines the phrase "adverse employment action." Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264 (10th Cir.1998). Such actions are not simply limited to monetary losses in the form of wages or benefits. Jeffries v. State of Kansas et al.,147 F.3d 1220, 1232 (10th Cir. 1998). The Court takes "a case-by-case approach," examining the unique factors  relevant to the situation at hand. Id.

_____

[34] Whether participating in protecting activity, or opposing an employer's practices, a plaintiff must have a reasonable or good faith belief that the complained-of conduct is illegal. See Crumpacker v. Kansas Dept. of Hum. Resources, 338 F.3d 1163 (10th Cir. 2003) (participatory); Pastran v. K-Mart Corp., 210 F.3d 1201, 1205 (10th Cir. 2000) (opposition).

Defendants contend that Gallo has failed to set forth evidence of an adverse employment action. I agree that Henington's "yelling" at Gallo does not begin to approach that level. Gallo urges the Court to accept as adverse action the "hostile environment directed toward other women, all due to Henington's violent temper" (Resp. at 25).  However, as I have already determined, the record contains no evidence of gender-based animosity toward Gallo or other female employees.

Gallo's removal as grievance representative by Sharon Morgan, although not specifically argued as such, is not an adverse action. Gallo has not established a causal connection between Morgan's action and Defendants. At worst, her removal was carried out for political reasons, and not motivated by retaliatory animus for any of the enumerated acts by Defendants.

Burnett's Notice to Recommend Dismissal does not amount to an adverse employment action, since Gallo had already taken employment elsewhere by the time the letter was issued, and cannot be said to have had an adverse effect on her status at LLHS.

While the investigation into Gallo's professional credentials, by itself, does not constitute an adverse action, the threat it imposed on her salary and possibly her employment status could be considered sufficiently adverse. See Jeffries, 147 F.3d 1220 (While unrealized threats often do not rise to the level of adverse employment actions, a threat of discharge from someone with considerable influence over the decision to discharge may be an adverse employment action). Moreover, whether this investigation can be considered adverse or retaliatory also rides on sheer credibility issues: Was the investigation prompted by an internal audit? Did Joel Gross contact Hunter College on his own initiative and did Hunter College provide him with a response? Did Julie Castillo tell Gallo that her P.D. was equivalent to a Ph.D. in New Mexico, or did Gallo misrepresent her professional status? The answers to these questions affect the integrity of

Defendants' disciplinary actions. Cmp., e.g., McKnight v. Kimberly Clark Corp. et al, 149 F.3d 1125 (10th Cir. 1998) (employer need only have good faith belief in reason for discharge to keep it from being pretextual).

The letters of reprimand issued on April 23, 2001 ("Code Blue") and on June 6th (for both "Code Blue" and "Columbine") could constitute adverse actions in the context in which they were issued. Although the Tenth Circuit has not enunciated a general rule regarding letters of reprimand, Dunlap v. Kan. Dept. of Health & Env't, 211 F.Supp.2d 1334, 1343 (D.Kan.2002), the law at that time was settled that employer actions that can have an adverse impact on future employment opportunities are legitimately regarded as adverse employment actions. Berry v. Stevinson Chevrolet, 74 F.3d 980, 986 (10th Cir.1996). In this case, Gallo was issued not one, but three letters of reprimand (two for the same "Code Blue" incident); she was told they would be placed in her file and that they would be considered with an eye toward possible dismissal should future disciplinary action be necessary. These facts create a dispute of fact as to whether these letters had a negative impact on her employment history. See Roberts v. Roadway Express, 149 F.3d 1098, 1103 (10th Cir. 1998) (the more warnings an employee received, the more likely he or she was to be terminated for a further infraction); Dunlap v. Kan. Dept. of Health & Env't, 211 F.Supp.2d 1334, 1343 (D.Kan.2002) (following Seventh Circuit's rule that negative performance evaluations standing alone, cannot constitute an adverse employment action, and concluding in case at bar that negative performance write-ups that were not placed in employee's personnel file and did not result in any disciplinary action did not constitute adverse employment action).

Although the paid administrative leaves or the PDR were not disciplinary, in the context of three letters of reprimand from Burnett (and one from Mr. Moffat who copied his letter of

reprimand to Burnett),[35] a reasonable fact finder could infer that the frequency of Gallo's run-ins with Defendants had an adverse impact on her employment future with LLHS.  A reasonable fact finder could also infer that even though Gallo was not constructively discharged, her disciplinary history could have persuaded her to start looking for employment when she did. See Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir.1996) (noting that pattern of retaliation began with plaintiff being "written up"); Jeffries v. State of Kan., 47 F.3d 1220 (10th Cir. 1998) (verbal interrogation and reprimand, threats to withdraw supervision and not renew the employee's contract were sufficient to constitute adverse employment actions even though the actions did not actually have an adverse impact on the terms and conditions of the employee's employment).

C.    Causal Connection

The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. Burrus v. United Telephone Co., 683 F.2d 339, 343 (10th Cir.), cert denied, 459 U.S. 1071 (1982). The facts show sufficient temporal proximity between Gallo's protected activities (March, April and May 2001) and Defendants' adverse actions (April, June and July 2001) to preclude summary judgment. See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir.1999) (holding that one and one-half month period between protected activity and adverse action may, by itself, establish causation; but that three-month period, standing alone, is insufficient to establish causation). As part of the causal connection between the protected activity and the

---

[35] Gallo maintains that Moffat's animosity toward her stemmed from her daring to represent Goodman in her assault grievance against Henington, and because of her role in the "Columbine" incident." The Court's inclusion of Moffat's letter in the retaliation analysis is not so much based on Moffat's letter by itself, but rather as a letter which was copied to Burnett, as evidence that Burnett was presumptively aware of the letter.

adverse action, no retaliatory claim is complete without a showing of retaliatory motive.

Purrington v. University of Utah, 996 F.2d 1025 (10th Cir.1993) (plaintiff must prove that the

defendant's action was intentionally retaliatory); Gunnell, 152 F.3d at 1262.  In this case, for

reasons set forth above, a reasonable fact finder could infer retaliatory motive. Accordingly,

Defendants are denied summary judgment based on qualified immunity on Plaintiff's Title VII

claim of retaliation.

## CONCLUSION

The Defendants' Revised Motion for Summary Judgment on Gallo's Corrected First

Amended Complaint (**Doc. 294**) is hereby GRANTED IN PART and DENIED IN PART as

follows:

(1) the motion is GRANTED in that Defendant Los Lunas School Board is hereby

DISMISSED from this action, and Defendants Henington and Burnett in their official capacities

are DISMISSED for the above stated reasons;

(2) the motion is GRANTED in that all Defendants are entitled to summary judgment on

Gallo's substantive due process claim under the Fourteenth Amendment (the individual

Defendants are entitled to qualified immunity, and all Defendants are entitled to summary

judgment) for the above stated reasons;

(3) the motion is GRANTED in that all Defendants are entitled to summary judgment on

Gallo's procedural due process claim under the Fourteenth Amendment for the above stated

reasons;

(4) the motion is GRANTED in that all Defendants are entitled to summary judgment on

Gallo's liberty interest claim under the Fourteenth Amendment for the above stated reasons;

(5)  the motion is GRANTED in that all Defendants are entitled to summary judgment on

Gallo's Title VII claim based on hostile environment for the above stated reasons;

(6) the motion is DENIED on Gallo's claim of retaliation under Title VII for the above stated reasons; and finally,

(7) the motion is GRANTED on Gallo's First Amendment claim with regard to alleged media communications and the Statement of Concern Gallo distributed on April 20, 2001, but DENIED based on qualified immunity on Gallo's First Amendment claim with regard to Gallo's union activities, for the above stated reasons.

**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE