**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

————————————

DONNA GALLO, et al.,

      Plaintiffs,

vs.

LOS LUNAS PUBLIC SCHOOLS,
an educational body of the STATE
OF NEW MEXICO, the LOS LUNAS
SCHOOL BOARD, the governing
body of the Los Lunas Schools, and
REX HENINGTON, individually and
in his official capacity,[1]

      Defendants.

Civil No. 01-640 WJ/DJS - **ACE**
(To be consolidated with
Civil No. 01-1298 and
Civil No. 01-1316 and
Civil No. 02-0529

**MEMORANDUM OPINION AND ORDER ON DEFENDANTS'
REVISED MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF
BERTENSHAW'S CORRECTED FIRST AMENDED COMPLAINT**

THIS MATTER comes before the Court on Defendants' Revised Motion for Summary

Judgment on Plaintiff Bertenshaw's Corrected First Amended Complaint, filed June 27, 2003

**(Doc. 296)**.  Having considered all the pleadings, memoranda and other materials submitted by the

parties, as well as the applicable law, I find that Defendants' motion is well-taken and shall be

granted.

————————————

[1]  The case (Civil No. 02-529, Doc. 7) is consolidated with other actions which have
previously been termed: Civil No. 01-640 (Plaintiff Eileen Montoya, termed July 3, 2003) and
Civil No. 01-1298 (Plaintiff Barbara Honeycutt termed July 3, 2003). In Civil No. 01cv1316,
Plaintiff Darlene Goodman was termed (March 25, 2003), but Plaintiff Gallo remains.

This consolidated case was initially brought separately by Los Lunas High School teachers Donna Gallo ("Gallo"),  Nicki Bertenshaw ("Bertenshaw"), Darlene Goodman ("Goodman"), Eileen Montoya ("Montoya") and Barbara Honeycutt ("Honeycutt") against the  above-named Defendants. Only Gallo and Bertenshaw remain as Plaintiffs.[2]  Bertenshaw is a former teacher at Los Lunas High School ("LLHS"). She contends that her problems started when Danny Burnett ("Burnett") became Superintendent of Los Lunas Public Schools ("LLPS") and hired Rex Henington ("Henington") as Principal in the fall of 1998.  Bertenshaw alleges that the "sexist and militaristic" attitudes of these individuals created an environment hostile to female teachers who spoke out against their "dictatorial and abusive conduct," and that the hostility increased when Bertenshaw became a union representative. As a result of the accumulated stress of the work environment, Bertenshaw, who apparently suffers from an auto-immune disease which is aggravated by stress, states that she suffered a "severe reaction" which landed her in the hospital. The six-count complaint alleges (1) Sexual Discrimination / Hostile Work Environment under Title VII, 42 § U.S.C.A. 2000e to 2000e-17; (2) Violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; (3) Retaliation under Title VII and the ADA; (4) First Amendment (§ 1983); and (5) Fourteenth Amendment Due Process (§ 1983) (6) Fourteenth Amendment Equal Protection (§ 1983).

## BACKGROUND

This case is plagued by the difficulty of trying to extricate the claims of Bertenshaw, and

---

[2]Goodman was termed as a Plaintiff on March 25, 2003 in Civil No. 01cv1316, which was consolidated with this case.  Gallo remains as a Plaintiff in that case.  Plaintiffs in two other consolidated cases, Montoya and Honeycutt (Civil No. 01-640 and Civil No. 01-1298), were also dismissed.

the facts relevant to those claims, from those of other plaintiffs.  The difficulty is compounded by counsel for Bertenshaw's perfunctory adherence to the requirements of Fed.R.Civ.P.56. In her response, she breezed through many of Defendants' statement of material facts ("DMF") with short "disagrees" and little or no presentation of truly contrary evidence. Then, Bertenshaw's counsel follows with *seventeen* pages of Bertenshaw's own "material" statement of facts ("PMF"). These pages contain a seemingly endless number of facts, many of which have little or nothing to do with relevance or materiality.[3]  The following discussion contains pertinent facts, as distilled from Bertenshaw's complaint and attached exhibits.  I include both undisputed and disputed facts with the factual inferences drawn in favor of Bertenshaw where evidence has been provided to support those inferences.

Bertenshaw was hired in November of 1996 as an English teacher at LLHS, and received good evaluations as a teacher. Bertenshaw was also a teachers' union ("NEA") representative in the 1999-2000 school year. Henington was hired as Principal in the 1998-99 school year.  At least half of the administrative team working with Henington has been female throughout his tenure.

1. <u>Doc Clary incident</u>. The first of the clashes between Bertenshaw and Defendants was the "Doc Clary" incident. Toward the end of September of 1999, Henington suspended several Mexican national students for dress code violations (wearing headbands depicting the Mexican

---

[3]  Some of Bertenshaw's "disagrees" appear entirely unfounded. For example, in response to DMF No. 45, asking Bertenshaw when she filed her EEOC charge, she stated "Plaintiff cannot agree without knowledge as to dates and forms sent to Defendants." Is the Court to believe that when Bertenshaw sent requested discovery documents to Defendants, she failed to keep a copy of her own documents for herself?

Also, both parties' briefs suffer from a common deficiency: I found myself going through the bulk of submitted evidence in order to grasp the full facts, instead of turning to the evidence to merely confirm the facts.

flag).  Henington held a meeting with these students, who had threatened a walk-out, in order to address their concerns,  including concerns with teachers.  The students mentioned that Bertenshaw was one of the teachers with whom they had issues, in that she had made allegedly racially negative comments.[4]  Mr. Hennington informed Bertenshaw about the students' perceptions. Bertenshaw told Henington that she knew that he had a "hit list" of teachers which had been created in the meeting with the students, and that another teacher, Doc Clary, had told her this. Doc Clary was angry and upset that Bertenshaw told Henington that he, Clary, had told her about the "hit list."  He approached Bertenshaw outside her classroom and "threatened" her, saying that if she brought up his name again in connection with the "hit list," she would be "through teaching here in Los Lunas."  Bertenshaw states that he also stated "I have influence. You are dead. You are gone, you are out of here."

Bertenshaw then went to Henington, described the incident as an "assault," and demanded that he file a police report against Doc Clary.  Henington declined because he did not witness the event, and told her that she would have to file the report herself. Burnett shared Henington's view that the police should handle assault charges. Henington also told Bertenshaw that she "brought all of this on [herself] by spreading this rumor [about the "hit list"]. Ex. 18.[5]  Bertenshaw did file a police report.  She never followed up when the police were unable to locate the report a few days later because  she "didn't have the time." Ex. 1 at 38. Bertenshaw said she wrote letters of

---

[4]  Henington had informed Bertenshaw that the students accused her of not letting them speak Spanish in class, and that if they "didn't like it here, they could go back to Mexico." Bertenshaw feels that Henington called the meeting because "he was afraid of their causing problems at the school." Ex. A at 29-30.

[5] Henington denies that he said this. Ex. 6 at 177.

complaint to Burnett and a school board member.

2. <u>Copy Machine issue</u>. In the beginning of the 1999-2000 school year, teachers were having problems with a faulty copy machine. Bertenshaw spearheaded an effort to obtain adequate copying resources for the faculty. After Henington allegedly ignored the problem for a while, he finally turned the matter over to William Moffat ("Moffat"), Deputy Superintendent of Finance and Assistant Superintendent. After several unsuccessful attempts to meet with Moffat -- who blamed the teachers for abusing the machine -- Bertenshaw then filed a grievance about the copy machine, which led to a resolution involving a new copy machine.  Ex. E. This incident led to the creation of a "Faculty Council" in February of 2000.

3. <u>Faculty Council</u>. The idea of a Faculty Council was suggested by Sharon Morgan ("Morgan"), NEA President of LLPS, and Moffat. Gallo chaired the Council. Ex. F.  The faculty elected ten teachers, two staff members and two administrators to the Council, which existed for most of calendar year 2000. Bertenshaw admits that she and Henington voted alike on many matters. However, she takes issue with the fact that Henington voted to limit Homecoming activities, then later signed a memo which took the opposite position and which criticized the Faculty Council for the resolution he had earlier supported. Also, Bertenshaw did not believe that the administration was adequately following up on issues raised with the Faculty Council.  In September of 2000, Henington explained that the Faculty Council would not take up issues of policy, and that it could only make recommendations. The Faculty Council was disbanded on motion by Bertenshaw and Gallo on November 30, 2000.

4. <u>Chain of Command</u>. The "Chain of Command" incident started with a letter sent on January 19, 2001, by Bertenshaw to Judy Romero ("Romero"), Assistant Superintendent of

Schools, regarding the advisability of a "tracking system" ("ability grouping") for English classes.[6] On January 29th, Romero wrote to Henington, directing him to advise Bertenshaw of the proper chain of command, meaning that Bertenshaw should first present issues to the high school administration before "addressing upper level administration or board members." Ex. G. Henington followed up with an internal memo to Bertenshaw dated January 31st, in which he advised her that her conduct in bypassing the chain of command was "breaking policy" and was "unprofessional." Ex. G. Henington felt that Bertenshaw had "deliberately diverted communication and the process in place," and advised Bertenshaw to "cease this type of reaction and behavior immediately." Henington also warned Bertenshaw that he would consider her insubordinate and would issue an "appropriate reprimand" if she chose to "continue not to follow" the chain of command.

A pre-grievance meeting was held on this matter on February 7, 2002, which Bertenshaw, Gallo, Lena Mae Chavez, Buddy Dillow and Henington attended. In a memo to Burnett dated the following day, Henington stated a "resolution was reached": Henington defending the chain of command policy and promising that "no retaliation or intimidation" would occur, and Bertenshaw defending her "1st Amendment Right of Free Speech," while "as a concession to courtesy" agreeing to abide by the policy. At Bertenshaw's request, another meeting was held on February 12, 2001, at which time she complained that her due process rights had been violated during the chain of command incident because Henington had not first approached her about the matter

---

[6] In her response, Bertenshaw attaches exhibits to which Defendants object because they are unauthenticated. One of these exhibits, Ex. 20, purports to be a copy of Bertenshaw's letter to Romero. Bertenshaw's position in that letter is that research did not support Romero's decision to phase out "ability grouping" for English classes. A handwritten note at the end of the letter indicates that a twenty-six page report was attached to the letter.

before making "accusations and threats."Ex. 21 at 7.[7]

     5.  <u>Darlene Goodman's Early Departure from Campus</u>. Facts concerning Goodman, a former co-Plaintiff, are not relevant to Bertenshaw's claims except as a catalyst driving much of the ill will between all original Plaintiffs in this case, and Defendants. On March 9, 2001, a confrontation took place in the school parking lot between Henington and Goodman. <u>See</u> Defts' Ex. I. The confrontation began over the issue of whether Goodman had followed proper procedures for leaving school early, and ended with Goodman subsequently filing criminal charges against Henington.

     6.  <u>Columbine incident</u>. April 20, 2001 marked the second anniversary of the Columbine High School shooting. The evening news on April 19th carried a story about a map of LLHS being found near the school, with the words "bomb" and "kill" on it. Bertenshaw became upset when she arrive at school the following morning, on the 20th, and saw extra security all over the campus. Bertenshaw drafted what she calls a "Letter of Concern" (as opposed to a "petition").[8] She then gave the letter to Gallo to distribute to the teachers for signatures, saying that she would help Gallo during the lunch hour. The Statement reads as follows:

> *WHY ARE TEACHERS ALWAYS THE LAST TO BE TOLD!!!!*
> 1)    *Last year when weapons were found on campus, the entire faculty and staff were promised by this administration that we would be notified the next time there was a threat or safety issue of any kind at the high school.*
> 2)    *Our students have been called out of class to be questioned about remarks they have made on the Internet.*

---

[7] At that meeting, Henington expressed some puzzlement about the purpose of the meeting, since he thought the issue had been previously resolved. Ex. 21 at 32.

[8] The "Letter" contained a position statement and was sent around for signatures, exactly like a petition.

      3)     *Security guards, Central Office personnel, and the police are all over the school ground.*

      4)     *On the Channel 13 television news last night, it was announced that a map of the high school had been found with the words "Kill" on it.*

*YET . . . . . . TEACHERS HAVE BEEN TOLD NOTHING ABOUT THIS ALERT! This is a major safety issue. We deserve to be informed!*

Ex. L.

Bertenshaw received a note directing her to see Henington, who informed Bertenshaw and Gallo that discipline would follow.[9]  Henington issued Bertenshaw a Letter of Reprimand on April 23, 2001. The letter stated that the circulated letter "disrupted the instructional process" and "contributed to a 'hotbed' of adversity on campus."  Bertenshaw was directed to "cease and refrain from this type of behavior in the future[,]" and prior to distribution, to present "written notices, announcements or petitions that create a hostile environment or adversity on campus." Henington stated that Bertenshaw would be considered "insubordinate" if she failed to comply with the letter's directive. Ex. M.

Bertenshaw grieved the issuance of this letter on May 16, 2001 to Henington, who denied the grievance. Bertenshaw appealed the decision in accordance with Step Two of the grievance process on May 29, 2001.  Bertenshaw did not attend that meeting, stating that she had an anxiety attack en route. Burnett issued a decision denying the grievance. Bertenshaw took no further action when the teachers' union elected not to pursue arbitration of the grievance.

     7.  <u>First EEOC charge</u>. Bertenshaw filed her first EEOC charge against LLPS on May 23, 2001, claiming that she had been subjected to a hostile working environment based on her sex,

---

[9]  The Columbine incident is common to Gallo's claims as well.  Bertenshaw and Gallo told Henington that they both wanted to represent each other as grievance representatives, which Henington refused to allow since both of them were implicated in the matter. Ex. A at 88. Gallo also received a Letter of Reprimand.

because she was "continually subjected to harassment, intimidation, unfair discipline and threats of termination by the principal, Mr. Rex Henington" in the period from September 1, 1998 to April 23, 2001. The Notice of the Charge of Discrimination that was sent to the Schools is dated June 6, 2001.

8. ADA claims. On May 8, 2001, Bertenshaw filed a "Reasonable Accommodation Request Form,"claiming that she has "a health problem when I am subjected to 'prolonged stress' and that "only *I* know what causes 'prolonged' stress." Ex. V. The reasonable accommodations requested on this form were "that the school principal follow the rules and regulations of the district." On the reverse side of the form, Bertenshaw stated:

> "the only accommodation that I request is as follows: Administrators will adhere to the following documents when dealing with me as an employee: Collective Bargaining Agreement, 1998-2001, Student Handbook, 2000-2001, Faculty Handbook, 2000-2001. . . These are sanctioned and approved by the school board and will protect my rights and my health."

9. Honors Class Assignment. Bertenshaw was advised in writing on May 23, 2001 that her 2001-02 schedule would change in that she would no longer be teaching Honors English. Bertenshaw claims that her failure to receive assignments to teach the Honors English class constitutes retaliation.[10] However, Bertenshaw was assigned to teach an Honors' Humanities class for the 2001-02 school year.

10. Removal as grievance representative. On June 1, 2001, Morgan, removed Bertenshaw as grievance representative. Morgan testified that she made this decision as to both Bertenshaw and Gallo because they were not following procedures or exercising good judgment. Ex. O at 69.

---

[10]  Defendants' Statement of Facts frames Bertenshaw's contention as one that includes a failure to get assignments "to teach Honors classes," whereas Bertenshaw describes the denial in terms of an Honors English class. Pltff's Resp. to Defts' SMF 56.

Morgan also stated that they were "unwilling to show any flexibility in representing the association perspective." Ex. O at 70.

11. <u>Amendments to EEOC charge</u>. On June 20, 2001, Bertenshaw amended her EEOC charge, adding, *inter alia*, that she had applied for an accommodation, but had been ignored.  In that amendment, Bertenshaw claimed that the events of the Columbine incident, including that a couple of administrators looked for the memo she had drafted on her computer when she claimed not to have a copy, constituted retaliation.[11]  On or about August 10, 2001, Bertenshaw again amended her EEOC charge, claiming that she had been "further retaliated against because I filed my most recent charge with EEOC."

12. <u>Employment History</u>. On January 7, 2002, her first day back to work after Christmas break, Bertenshaw left after a few hours because she started "getting really dizzy again." Ex. A, 172, 5-22. After January 7th, Bertenshaw requested, and was granted, numerous medical leaves. Ex. C at 7-10. Bertenshaw was offered re-employment with LLPS for the 2002-03 school year, which she accepted on June 5, 2002. Bertenshaw again sought additional medical leave, which was granted through the first semester to December 20, 2002.

Bertenshaw resigned on July 19, 2002, while still on medical leave.  In her letter of resignation, Bertenshaw stated that she could not work any longer under Henington or Burnett, who recently received extended three-year contracts. Ex. Y. Thus, January 7, 2002 became Bertenshaw's last day of work at LLPS.  She has not sought employment since that time.

13. <u>EEOC No Cause Determination</u>. On February 19, 2002, the EEOC issued a No Cause

---

[11]  Bertenshaw does not dispute Defendants' presentation of these facts.

Determination on Bertenshaw's initial and amended charges.[12] The EEOC found:  no evidence of gender based harassment; no violation of the ADA, "as [charging party] was requesting an accommodation that [respondent] follow the CBA [collective bargaining agreement]"; and no evidence of retaliation on Bertenshaw's claim that she did not receive an Honors English class teaching assignment. Ex. T.[13]

The EEOC investigator who drafted the No Cause Determination found that Bertenshaw had been disciplined for "valid policy violations." In finding no ADA violation, the investigator questioned  how requiring an employer to follow the CBA would remove a barrier to equal employment opportunity.

## DISCUSSION

**Legal Standards**

Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  An issue of material fact is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." Moya v. U.S.A. et al, 35 F.3d 501, 503 (10th Cir. 1994), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). When, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying "a lack of evidence for the nonmovant on an essential element of the

---

[12]  Bertenshaw's dispute with this Statement of Fact is that it is "*not* a finding of discrimination *vel non*, with the investigator's recommendation." (emphasis supplied in original). Bertenshaw does not, however, dispute that the findings are as represented either in Defendants' Statement of Fact or in the exhibit submitted, Exhibit T.

[13]  It is not clear which of the EEOC amended charges included the claim related to the Honors teaching assignment.

nonmovant's claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir.1998). To

avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the

presence of each element essential to the case. Bausman v. Interstate Brands Corp., 252 F.3d

1111 (10th Cir. 2001).

The individual Defendants raise the defense of qualified immunity for claims brought by

Bertenshaw under 42 U.S.C. § 1983 (First Amendment, Fourteenth Amendment Substantive and

Procedural Due Process, Fourteenth Amendment Equal Protection). The doctrine of qualified

immunity not only protects government officials from the costs associated with trial, but also from

"the other burdens of litigation," which include "'the burdens of broad reaching discovery.'"

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Once a public official raised a qualified immunity

defense, as the individual Defendants have done here,[14] the plaintiff has the burden of coming

forward with sufficient facts to assert a violation of a constitutional right, and of demonstrating

that the law was clearly established at the time of the defendants' actions. Clanton v. Cooper, 129

F.3d 1147 (10th Cir.1997) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). Once the plaintiff

meets this twofold burden, the public official then assumes the usual summary judgment movant's

burden of showing that there are no genuine issues of material fact and that he or she is entitled to

judgment as a matter of law. Hinton v. City of Elwood, Kan., 997 F.2d 774, 779 (10th Cir. 1993)

(cited in Howard v. Dickerson, 34 F.3d 978 (10th Cir. 1994); Fed.R.Civ.P. 56(c). Specifically, the

public official must show that no material issues of fact remain as to whether his or her actions

_____

[14] Qualified immunity is not available as a defense to a governmental entity. Owen v. City of Independence, 445 U.S. 622, 638 (1980); Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2000).

were "objectively reasonable" in light of the law and the information he or she possessed at the time. Id.

## I.   Count One - Sexual Discrimination / Hostile Work Environment under Title VII[15]

Title VII forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Bertenshaw alleges both that she was discriminated under Title VII, and that she was subjected to a hostile work environment.

A. Discrimination Claims

In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), the United States Supreme Court established a three-stage process for analyzing discrimination claims. First, the plaintiff must show a prima facie case of discrimination, which gives rise to a presumption of discrimination.   Second, the burden shifts to the defendant to rebut the presumption by offering a legitimate, nondiscriminatory reason for the plaintiff's discharge. Third, the plaintiff must then show the defendant's proffered reason for discharge is a pretext for discrimination. If the defendant successfully meets its burden of production, the burden shifts back to the plaintiff to put forth evidence sufficient to allow a jury to find that the defendant's reason is pretextual, e.g., that it is unworthy of belief. Id. at 804; Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1208 (10th Cir. 1999). To establish a prima facie case of gender discrimination, Bertenshaw must show that:  (i)

---

[15]   In response to Defendants' arguments that Henington and Burnett cannot be sued under Title VII, Bertenshaw concedes that point and clarifies the various Defendants' basis for liability (which was lacking in the complaint): (1) Title VII and ADA claims against the School Board, (2)  First Amendment freedom of speech and association, and Fourteenth Amendment equal protection against Henington, with supervisory liability alleged against Burnett. Response at 30. Bertenshaw fails to specify how her due process claims are alleged, nor does she mention how LLPS, a named Defendant, fits into her claims.

she belonged to a protected class; (ii) she suffered an adverse employment action  and (iii) she was treated less favorably than her male counterparts.  Cole v. Ruidoso Municipal Schools, 43 F.3d 1373, 1381 (10th Cir. 1994).

The complaint does not specify how Bertenshaw was treated differently. In her response brief, Bertenshaw lists the following factual bases for her disparate treatment claim:

(1)     disparity between the treatment of male teacher Rick Cole and Bertenshaw;
(2)     disparity between Bertenshaw and Dave Peters, who admitted Bertenshaw's letter to Romero was his responsibility and received not so much as a mild rebuke;
(3)     disparity in Henington's reaction to reports that male teacher Doc Clary assaulted Bertenshaw in front of witnesses;
(4)     disparate treatment of male and female grievants by Burnett
(5)     disparate treatment by Henington and Burnett of Cip Portillos
(6)     Henington's disparate attitude toward male union representatives;
(7)     a pattern and practice of discrimination against women in conditions of employment, including discipline and threats of discipline to which men were not subjected.

None of these claims have merit. For some, Bertenshaw does not even meet the requirements of the prima facie case, since she cannot show she suffered an adverse employment action. For purposes of Title VII, an adverse employment action is one that alters the employee's compensation, terms, condition, or privileges of employment, or adversely affects her status as an employee.  Heno v. Spring/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2000). The Tenth Circuit liberally defines the phrase "adverse employment action." Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir. 1998) and takes a case-by-case approach in determining whether a given employment action is adverse.  Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264 (10th Cir. 1998).

I run through Bertenshaw's list of allegedly disparate treatment to illustrate:

Factual Basis No. 1:   Bertenshaw relies on testimony from an assistant principal, Michelle Osowski, who had heard Henington make "negative comments" about Cole, a science teacher, for

going "over his head in terms of correspondence about the science curriculum." This comment does not explain to whom Cole went to, or whether Henington ever approached Cole about his conduct. Further, I do not agree with Bertenshaw's characterization of the Chain of Command letter she received after going directly to the Board as a reprimand. The letter clearly served as a preliminary warning. Also, the letter was generated by Henington only after Romero requested that Bertenshaw be reminded about following the appropriate procedure for such letters. At any rate, the Chain of Command letter does not rate as "adverse employment action" under Title VII, since it did not affect Bertenshaw's "terms or conditions of employment by any sense of the phrase."

Factual Basis No. 2:   Bertenshaw's "defense" to receiving the Chain of Command letter is that she wrote the letter at the behest of Dave Peters, Head of the English Department. Ex. 20 at 12.[16] This fact does not affect the ultimate factual finding that the letter Bertenshaw received from Henington was not an adverse employment action.

Factual Basis No. 3:   Henington's "reaction" consisted of refusing to file a police report for an incident he did not witness. He did not prevent Bertenshaw from filing a report herself; in fact, he appropriately suggested that she file the report. Henington's alleged statement that she brought Doc Clary's wrath on herself was not an adverse employment action, nor does it hint at discriminatory motive.

Factual Basis No. 4:   There is no evidence to support a prima facie showing of disparate treatment of female grievants by Burnett. The "disparate treatment" Bertenshaw alleges consists of the requirement of being sworn in before giving testimony at a hearing; that the hearing officer would make decisions on admissibility of exhibits; and that the proceeding would be recorded but that Bertenshaw could not do the recording. Ex. 1 at 134-35. Aside from the fact that nothing in these requirements seems improper for due process purposes, Bertenshaw presents absolutely no support for her allegation that the process is any different for male grievants.

Factual Basis No. 5:   Bertenshaw premises her claim of disparate treatment on alleged treatment by Henington and Burnett of someone other than herself, i.e., Gallo. PMF 49(g). Bertenshaw cannot meet her prima facie case by alleging that *someone else* suffered an adverse employment action.[17]

Factual Basis No. 6:   When Bertenshaw and a new male union representative drafted a

---

[16]   The January 19, 2001 letter to Romeo indicates that it was sent only by "N. Bertenshaw, English Department."

[17]   The claim would fail even with regard to either the Chain of Command letter or the April 23rd Letter of Reprimand.  In discriminatory discipline cases, an inference of discrimination may be raised by "evidence that a plaintiff was . . .  treated  less favorably than similarly situated employees who are not in the plaintiff's protected class." Hardy v. S.F. Phosphates Ltd., 185 F.3d 1076, 1082 (10th Cir.1999) (quoted case omitted).  Cip Portallis is a male teacher who was accused of sexual misconduct – hardly an example of "similarly situated" with regard to the basis for the letters issued to Bertenshaw.

letter from the faculty for Henington's review, Henington invited the male representative to meet with him, and excluded Bertenshaw. PMF 49(d). Even taking this turn of events to be true, I am at a total loss to see how Henington's decision to meet with the male representative, and not Bertenshaw, affected the terms and conditions of her employment.

Factual Basis No. 7:   This disparate treatment claim fails for the same reason as (5). Not only do all of these alleged incidents happen to other individuals, but most of them are described through inadmissible hearsay.

Although the above instances listed as examples of disparate treatment may have caused Bertenshaw some hurt feelings and unhappiness (e.g., when Henington invited a male union representative to visit him and excluded her), they resemble petty office politics rather than adverse employment actions redressable under Title VII.  I find that Bertenshaw fails to demonstrate the adverse employment action element of her prima facie case. Accordingly, summary judgment shall be granted to Defendants on Bertenshaw's Title VII disparate impact claim.

B.   Constructive Discharge

Bertenshaw mentions constructive discharge as an adverse employment she suffered.  It is not clear how Bertenshaw alleges constructive discharge.  It appears to be asserted in the complaint (¶34), but is not included in any of the alleged theories. Nevertheless, I make these findings on constructive discharge relative to its possible application in any of Bertenshaw's claims alleged in the complaint. Constructive discharge would indeed constitute an adverse employment action if it occurred -- which it did not.  The law has been clearly established since at least 1986 that constructive discharge exists when a reasonable person would view the working conditions as intolerable and when the working conditions are so difficult that a reasonable person in the employee's position would feel compelled to resign. Derr v. Gulf Oil Corp., 796 F.2d 340,

16

344 (10th Cir.1986) (applying constructive discharge in a Title VII case).

A major flaw in Bertenshaw's case is the sparsity of incidents in which she herself was involved. The "support" for her arguments are replete with inadmissible hearsay about what Henington or Burnett did to other staff members, most of which are inconsequential in the context of Title VII claims. Taking all of Bertenshaw's allegations as true, I do not find that Bertenshaw was subjected to intolerable working conditions. Bertenshaw spent the last six months of her employment at LLHS out on medical leave, which was not actually scheduled to expire until months after her resignation. In fact, as early as May 29, 2001, Bertenshaw expressed her intention to retire in December of 2001. DMF 37; Ex. A at 139. Bertenshaw's resignation from LLHS was her own voluntary decision. Therefore, I conclude that Bertenshaw was not constructively discharged, and, to the extent that Bertenshaw is alleging a claim for constructive discharge, summary judgment shall be entered in favor of Defendants on this claim.

C.  Harassment Claims

Title VII's prohibition against sex discrimination includes a ban on sexual harassment. Harris v. Forklift Systems, Inc, 510 U.S. 17 (1993) 114 S.Ct. 367, 370; Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986). Under Title VII, employers are vicariously liable for hostile environment sexual harassment perpetrated by a supervisor. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998). Sexual harassment cases are based either on a tangible employment action taken against an individual, or on offensive conduct in general." Burlington, 524 U.S. at 760-62.[18]

---

[18]  Prior to Burlington, cases were categorized as either *quid pro quo*, or *hostile environment* harassment. *Quid pro quo* cases occurred where "specific benefits of employment are conditioned on sexual demands" by the victim's supervisor. Ball v. Renner, 54 F.3d 664, 665

*1.     Tangible Employment Action*

For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257, 1264 (10th Cir.1998) (quotations omitted). In order to determine whether conduct was sufficiently severe or pervasive enough to be actionable for sexual harassment, a court must consider "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Cadena v. The Pacesetter Corp., 18 F.Supp.2d 1220, 1226 (D.Kan.1998) (citing Faragher, 524 U.S. 775 (1998) (internal quotes omitted).  In considering these factors, a court also must consider the context in which the conduct occurred.  Id. (citing Smith v. Norwest Financial Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir.1997)). Additionally, the harassing conduct must be "both objectively and subjectively abusive." Turnbull v. Topeka State Hospital et al, 255 F.3d 1238, 1243 (10th Cir. 2001) (citation omitted).

Bertenshaw's Title VII harassment claim cannot proceed under a theory that she suffered a tangible employment action, because none of the alleged actions by Defendants constitutes "a

n. 2 (10th Cir.1995). *Hostile environment* harassment occurs where a supervisor's sexual conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986). These terms are now relevant to Title VII litigation only to the extent that they "illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general." Burlington, 524 U.S. 742, 760-62 (1998).

significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing a significant change in benefits."

Burlington, 524 U.S. 742, 761 (1998).  Neither the Chain of Command letter, nor the Letter of

Reprimand issued on April 23, 2001 rises to the level of actions sufficiently adverse to be

considered tangible employment actions under a Burlington analysis. Bertenshaw makes much of

not getting the Honors English as a teaching assignment, but the removal of this class from her

teaching assignments did not impose "significantly different" teaching responsibilities.  Moreover,

Bertenshaw concedes that she received an assignment to teach the Honors Humanities class for

that same school year.

Simply stated, Bertenshaw has failed to establish that she suffered any tangible

employment action. Her sole remaining theory under Title VII is under hostile work environment.

2.      *Hostile Environment*

In order to survive summary judgment on this claim, Bertenshaw must "show that a

rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule,

and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." Davis v. U.S. Postal Serv., 142 F.3d

1334, 1341 (10th Cir.1998) (quotation omitted). "Whether an environment is hostile or abusive

can be determined only by looking at all the circumstances including the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance." Id. (quotation omitted). "[A] sexually objectionable environment must be both

objectively and subjectively offensive, one that a reasonable person would find hostile or abusive,

and one that the victim in fact did perceive to be so." <u>Faragher</u>, 524 U.S. 775, 786 (1998), <u>cited in</u> <u>Stinnett v. Safeway, Inc</u>. 337 F.3d 1213 (10th Cir. 2003). The case law on hostile environment claims was clearly established at the time the underlying events occurred.

The critical issue for any hostile environment claim is "whether members of one sex are exposed to disadvantageous terms or conditions to which members of the other sex are not exposed." <u>Oncale v. Sundowner Offshore Services, Inc</u>., 523 U.S. 75, 80 (1998). In this case, despite the seemingly endless litany of transgressions recorded by Bertenshaw, she still does not make the threshold showing that her gender had any connection to those actions.  I have grouped these incidents for easier analysis.

**Group 1**

These allegations are either immaterial or irrelevant to Bertenshaw's hostile environment claims.[19]  Almost all of them refer to clashes Henington had with other staff members, most of whom are former co-Plaintiffs.  Either these incidents have no bearing on her claims, or they are completely devoid of any gender-based inference: (numbered according to Bertenshaw's Statement of Material Facts).

*PMF 34*: Burnett upheld grievances filed against Henington by women, but reversed one filed by

---

[19]  Bertenshaw shies away from telling the Court which facts she relies on for her different theories. Instead, she amasses a huge number of facts, strings them together in what she calls a "Statement of Material Facts," (whether or not they are material), and then leaves the Court with the chore of figuring out what facts could possibly go with which claims. For example, Bertenshaw's response to the summary judgment motion on her Title VII claims is barely one page, with no distinction between her arguments for disparate treatment and harassment. The Court expected much better, given Bertenshaw's need for extensions of page limitations, which still doesn't seem to be sufficient. <u>See</u> Response at 21, n.10.

Cip Portillos (the male teacher accused of sexual misconduct).[20] There is no way to evaluate this claim. Bertenshaw is trying to sell the Court this package: (a) all of the grievances to which she refers, which were all filed by women (and on which she presents no evidence except for her own grievances), had merit such that they should have been upheld, and (b) they were *not* upheld because women filed them.

*PMF 35*: Montoya (a former co-Plaintiff and Dean of Students) was "subjected to a screaming tirade from Henington" (with no description of the language)." In her deposition, Montoya referred to a comment Henington once made that "she should wear a dress to the prom 'slit up to her hip.'"[21]

*PMF 36*: Henington regarded Montoya as disloyal because he felt that she voted against him in faculty council meetings.

*PMF 37*: Henington called Honeycutt (another former co-Plaintiff) into an empty office, and stood between Honeycutt and the door "yelling and screaming with a red face and his hands in her face."

*PMF 38*: Former co-Plaintiff Lois Goldfarb left her employment at LLHS because of Henington. According to the EEOC complaint filed by Goldfarb, Ex. 51, Goldfarb also left because of Ms. Chavez, the assistant principal.

*PMF 39*: This refers to the Goodman "assault" incident which took place in the school parking lot, at which time Henington reportedly accused Goodman of not signing out.

*PMF 40*: Henington's alleged comment to Gallo about getting her to drop Goodman's grievance and criminal charge.

*PMF 41*: Allegation that Burnett "changed the rules" for the Goodman grievance. As mentioned above in the discussion under disparate impact, there is no evidence to support this contention.

*PMF 42*: Henington reacted "furiously" to the presence of Judy Garner, a union representative, at a meeting between Henington and a teacher, Gina Vitale. What is curious about this allegation is that Henington himself threatened to file a grievance against the NEA for "interfering with his

---

[20]  I assume Bertenshaw means "Danny Burnett upheld every grievance filed by *Henington* against *women*," and not vice versa. The relevant exhibit supposedly supporting this fact, Exhibit 43, is sealed. Henington issued a written reprimand, which was ultimately reversed by Burnett.

[21]  This is the only sexually explicit remark Henington is alleged to have made which is contained in the record. See Ex. 8 at 117. Montoya stated that she received and accepted an apology from Henington at a meeting she requested following the incident.

management," and against Garner for "harassing him." Henington later wrote to Morgan requesting that Garner be removed as union representative. Ex. 58.[22]

*PMF 43*: Garner had written a grievance outlining complaints by women about Henington (apparently unrelated to PMF 42), which Burnett refused to accept at the next grievance level.

*PMF 44*: In mid-2001, teacher Patty Barber filed an EEOC complaint against Henington. Bertenshaw objects to the fact that in their depositions, Henington and Burnett agreed with statements prepared by lawyers in the response to Barber's EEOC charge.[23]

*PMF 45*: Henington believed that mostly women were targeting him, and that he couldn't recall male teachers who had disagreed with his "management style." I decline to attach any importance to the sole fact, even if true, that more women than men disagreed with Henington's management style in a workplace that was composed mostly of women. Ex. 4 at 131. Henington's belief that more women than men had "targeted" him because of his management style and personality does not necessarily run the other way, i.e., that Henington unfairly treated women, without specific evidence that such conduct occurred. Bertenshaw's contention that Henington did not abuse men is not supported by Garner's testimony, on which relies. Garner agreed that many men probably felt that Henington acted the same way toward them, but opined that men "handle it differently. . . they don't take as much offense. . . ." Ex. 4 at 131-32.

*PMF 47*: Henington "talked down" to Montoya in a faculty meeting, and was "abrasive and angry toward women in meetings." Again, Bertenshaw offers no specifics on the language Henington used. Bertenshaw contends that Henington did not like Montoya, and in general felt "threatened"

---

[22] Henington objected to Garner's attempts "to control and conduct meetings from beginning to end, and at times, will not even allow the employee or the administrator to speak." Henington also stated that he felt that Garner tendency to use personal attacks caused a "negative effect on the educational process." Ex. 51.
Henington's statements in his letter to Garner do not display any gender-based animus, but rather an objection to Garner's interfering style, which is not subject to redress under Title VII. See McCollum v. Bolger, 794 F.2d 602, 610 (11th Cir.1986) ("Personality animosity is not the equivalent of sex discrimination and is not proscribed by Title VII").

[23] The statement essentially states that the co-Plaintiffs in this case, most of whom have some representative positions in the local teachers' union, have targeted Henington and other school administrators because they "disagree with Henington's management style and his personality. . . They want more power and authority in the decision-making process and are frustrated by some of the decisions made by Henington and his administration. . . Thus, this group of teachers have attempted to characterize Henington's actions and the actions of other District Administrators as discriminatory or retaliatory for the purpose of discrediting Henington and the District Administration in hopes of getting their way." Ex. 60.

by "outspoken" or "competent" women. In her deposition, Montoya describes Henington as "not diplomatic. . . He's getting a lot better."   Bertenshaw provides a hearsay description of an incident where Marsha Moyers, a teacher, was "reprimanded" for wearing jeans even though "men do it all the time. . . ."[24] In Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1174 (10th Cir.1996), the court assumed that imposing special appearing rules on members of only one sex may violate Title VII.[25] Unlike the plaintiff in Lowe, Bertenshaw does not allege that her employer has imposed different dress codes for the men and women, but rather that they are differentially enforced. Even so, the claim fails for several reasons.  First, Bertenshaw offers only a general conclusory allegation which itself is based on hearsay (Moyers told Garner, who testified to the matter in her deposition).  Second, there is no reasonable basis to believe that an uneven application of the dress code either unreasonably interfered with Bertenshaw's work performance, or created an "intimidating, hostile, or offensive working environment,"since apparently Bertenshaw was never approached about dressing inappropriately. Third, Garner's statement in her deposition, which Bertenshaw cites to ("other teachers wore jeans all the time, particularly the men teachers") does not indicate that the issue was one that was gender-based, but rather indiscriminately inconsistent. Fourth, other than being "reprimanded" or "faulted," it is not clear how serious the consequences were as a result of a male or female teacher being called on for wearing jeans to school.

Bertenshaw's "material facts" have one thing in common: very few concern her personally. It is true that evidence of a generally harassing work atmosphere, in addition to evidence specifically showing harassment of the plaintiff, is an important inquiry in evaluating hostile environment claims.  Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987). However, such evidence must still rise to the level of "severe or pervasive" to be actionable, and they still must be gender-based.  Bertenshaw's "material facts," even when taken together, are neither.

Bertenshaw does mention two incidents over which she still bristles.  One is Henington's refusal to file police charges against Doc Clary after Clary allegedly assaulted Bertenshaw, and his

_____

[24]  This particular claim more aptly fits into a disparate treatment analysis. However, this matters little, since Bertenshaw does not present evidence sufficient to help the claim survive either under a disparate treatment or a hostile work environment claim.

[25]  The plaintiff in Lowe failed to establish a prima facie case of disparate treatment based on the requirement she wear dress clothes.

subsequent comment to her that she brought Clary's wrath on herself. The other is Henington's seemingly nonchalant response to the copy machine crisis. These assertions against Henington must go the same way as Bertenshaw's other "material facts" discussed earlier, since no fact finder could reasonably consider Henington's responses to have either been gender-based or to have contributed to an offensive work environment.

**Group 2**

Sprinkled within Bertenshaw's deposition are other incidents which the Court finds hardly worth mentioning, much less discriminatory or sexually harassing. Bertenshaw evidently felt that Henington's negligence in addressing concerns she had with air quality in her room was "harassment." Ex. A at 242.[26] Bertenshaw also found "harassing" Henington's suggestion that she "rewrite the "faculty handbook" when Bertenshaw felt she had to "explain all of the manuals that he didn't know about." Ex. A at 244:8-12. I find that such claims are so disconnected from any semblance of hostile environment that they are frivolous. In fact, the Court is left with the definite impression that the vast majority of Bertenshaw's Statement of "Material" Facts are little more than an excuse to dredge up every conceivable grudge she or any other teacher at LLHS could possibly have against Henington or Burnett. While such evidence may paint a picture of Henington as an administrative bully with an autocratic style (a contention Defendants concede), it does not support Bertenshaw's claim of hostile environment, or any other claim.

**Group 3**

As examples of Henington's mistreatment of women, Bertenshaw lists at least twenty

---

[26] Bertenshaw later sent a letter to Joe Trujillo, assistant principal, thanking him for correcting the problem. The implication here is Henington's unresponsiveness to the problem.

incidents where Henington yells at, or "talks down" to women. As with her other "material" facts, they all concern other staff members, mostly former co-plaintiffs.

Yelling, or neutral verbal abuse, is not actionable under Title VII. <u>Hardin v. S.C. Johnson & Son, Inc</u>., 167 F.3d 340, 345-46 (7th Cir.1999) ("persistent cursing and use of abusive language" is not harassment where there is nothing "inherently. . . discriminatory" about the comments); <u>Holtz v. Marcus Theatres Corp</u>., 31 F.Supp.1139 (N.D.Ill.1999) ("Merely yelling at female employees and calling them names does not rise to the level of an actionable hostile work environment"); <u>Webster v. Bass Enterprises Production Co</u>.192 F.Supp.2d 684 (N.D.Tex.,2002) (shaking papers at female employee, denying employee vacation and sick leave, and using a loud voice, was not related to gender and was not sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment, as required for employee's hostile work environment claim under Title VII); <u>Nestle U.S.A. Co</u>., 181 F.3d 958, 965 (8th Cir.1999) (affirming summary judgment in a sexual harassment case because cursing and "rude and snotty" behavior was not based on plaintiff's sex).

After reviewing the rather tedious list of offending verbal abuse, I have concluded, based on overwhelming evidence, that yelling was Henington's usual and favorite management style. Henington yelled at women, but also yelled at men and even students. <u>See</u> Ex. 7, 134-35. Bertenshaw's observation that male teachers did not complain (even assuming this is true) is immaterial to the issue of whether Henington ever yelled at men. It is also immaterial to the critical question of whether Henington's conduct was gender-motivated.

Bertenshaw relies on <u>Steiner v. Showboat Operating Co</u>., 25 F.3d 1459, 1463-64 (9th Cir. 1994), Resp. at 23, n.12,  for the proposition that Henington's "equal opportunity" bullying does

not get him off the hook. Steiner does not help Bertenshaw's case. In Steiner, while the evidence showed that although defendant was abusive to men and women alike, his abusive treatment and remarks to women were of a sexual or gender-specific nature. They were found to be "sexually explicit, offensive, highly derogatory, and publicly made." Id. This is not so in Bertenshaw's case. None of the instances of Henington's yelling was  gender-specific, which is the hallmark of  Title VII hostile work environment claims.  Cmp. Haug v. City of Topeka, Equipment Management Div., 13 F.Supp.2d 1153 (D.Kan.,1998) (alleged yelling was directed at both male and female employees and did not include gender-based vulgarity used to characterize any female employee); Dickerson v. SecTek, Inc., 238 F.Supp.2d 66 (D.D.C. 2002) (calling female employee "bitch" and "chick," visiting strip clubs with other male employees, harassing, taunting, and  yelling directed at female, but not male, employees, and undermining of female employees' supervisory authority, created a hostile work environment).

Based on the description of Henington by both parties, I gather that he is a large man, with a loud voice and expansive mannerisms held over from his "football coaching days."  Henington himself understands that his style could be "misinterpreted as being angry and intimidating." Ex. 6 at 131. While Title VII does not exempt large, loud persons from its mandate, a plaintiff is still required to make a showing that the conduct and statements made by such individuals meet threshold showings of being gender-based and more than mildly uncomfortable.  Simply stated, being a jerk in and of itself is not enough to impose liability under Title VII.

In sum, Defendants are entitled to summary judgment on Bertenshaw's Title VII claims, under both disparate treatment and hostile work environment, which will be dismissed. Title VII requirements "are sufficiently demanding to ensure that Title VII does not become a 'general

civility code.'" <u>Faragher</u>, 524 U.S. at 787, citing <u>Oncale</u>, 523 U.S. at 80; <u>see</u> <u>Logan v. Kautex</u> <u>Textron North America</u>, 259 F.3d 635, 641 (7th Cir.2001) (a workplace must be "hellish" before it is actionable as a hostile environment). Based on the facts in this case, a reasonable fact finder could easily conjure up a picture of a workplace where different cliques vied for political control, and where personality conflicts abound.  A reasonable fact finder, however, could not find a work environment that was permeated with discriminatory intimidation, ridicule, and insult, sufficiently severe or pervasive to alter the conditions of Bertenshaw's employment.

## II.    Count Two - Violations of the Americans with Disabilities Act ("ADA")

Bertenshaw contends that Defendants failed to provide a reasonable accommodation to her impairment "in the form of freedom from prolonged stress." Resp. at 23.  For Bertenshaw to prevail on this claim, she must show (1) that she is a qualified individual with a disability within the meaning of the ADA; (2) that her employer was aware of her disability; (3) that she requested a reasonable accommodation; and (4) that her employer denied her request for a reasonable accommodation. <u>Lowe</u>, 87 F.3d at 1174 (citing  42 U.S.C. § 12112(b)(5)(A)). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  <u>See</u> <u>White v. York Int'l Corp</u>., 45 F.3d 357, 360 (10th Cir.1995). The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." <u>Sutton v. United Air Lines</u>, Inc., 527 U.S. 471, 478 (1999); <u>Pack v. Kmart Corp</u>., 166 F.3d 1300 (10th Cir.1999).

I agree with Defendants that Bertenshaw does not suffer from an impairment as envisioned

27

under ADA.[27] Even assuming that Bertenshaw has an "impairment" as described under 29 C.F.R.

§ 1630.2(h), Bertenshaw's own submitted evidence is inconsistent with a finding that it

substantially limits one of her major life activities. According to a doctor's note dated April 25,

2001, Bertenshaw suffers from an autoimmune disease which becomes exacerbated "when

exposed to prolonged stress." Ex. 30.[28] The note stated that "[e]very effort should be made to

avoid placing this patient in conditions of prolonged stress." Ex. 30.  In a response dated August

3, 2001 to an inquiry by Burnett into Bertenshaw's medical condition, that same doctor provided

information on her medical status. According to this information, Bertenshaw did not have a

medical condition that adversely affected mobility, self-care and recreation, or that precluded her

from "performing any of the particular tasks and duties on the attached job description and

essential job functions list you enclosed." Ex. 34. The report also opined that Bertenshaw did not

have a condition which prevented her from "being at work during normal hours. . . ."  In other

words, in the words of Bertenshaw's own doctor, Bertenshaw could not meet the threshold

requirements of an ADA claim.  The only evidence of Bertenshaw's alleged impairment is her

request for medical leaves, which apparently became more frequent in January of 2002.  However,

that by itself is not sufficient to establish that she was "disabled" for ADA purposes at that time.

Cmp., Croy v. Cobe Laboratories, Inc. et al, No. 02-1366 (10th Cir. 2003) (finding plaintiff not

---

[27]   The ADA does not define a "physical or mental impairment."  Sutton, 527 U.S. 471
(affirming 130 F.3d 893, 898 (10th Cir.1997)). The term "impairment" is not defined by the
statute. However, the statute does require that the impairment "substantially limit" a major life
activity. See §42 U.S.C.  12102(2)(A).  Thus, the impairment must be significant, and not merely
trivial. Welsh v. City of Tulsa, Okl., 977 F.2d  1415, 1417 (10th Cir.1992).

[28]   In Bertenshaw's appeal of her initial rejection for disability benefits under her insurance
policy, there is mention of a diagnosis of "Sjorgren's Syndrome. Ex. Z.

disabled because her fatigue from multiple sclerosis, inability to lift heavy objects and to care for her children, was not substantially limiting to a major life activity; it only indicated that plaintiff found it necessary to "take many unscheduled absences from work").

Bertenshaw spends six (6) lines in support of her ADA claim. Resp. at 23. She argues that Defendants denied her "requested accommodation," which prompts the next question: exactly what did Bertenshaw ask for in the way of reasonable accommodation?  Bertenshaw was required to propose an accommodation and then show that the accommodation is objectively reasonable. Woodman v. Runyon, 132 F.3d 1330, 1344 (10th Cir.1997) (employee must show how her requested accommodation would have allowed her to perform the essential functions of her job; White v. York Int'l Corp., 45 F.3d 357, 361 (10th Cir. 1995)(plaintiff must produce evidence sufficient to make a facial showing that accommodation is possible);[29] see also Smith v. Midland Brake, Inc., 180 F.3d 1154, 1171 (10th Cir. 1999) (employee's request for reasonable accommodation must be specific enough so that the employer would know whether the accommodation may be found in a reassignment job within the company).

Here, Bertenshaw simply requested, through her physician, that she not be exposed to "prolonged stressful situations which [Bertenshaw] describes as 'unfair, intimidating, or threatening treatment by administrators.'" Ex. 34 at 2.  There is no evidence that Bertenshaw asked for a part-time position, job reassignment, or job restructuring. Instead, she asked not to be subjected to "what she perceives as 'unfair employee treatment.'" I find this request not to be a

---

[29]  In White, the plaintiff offered no evidence that a reasonable accommodation was possible.  Instead, he simply continued to assert the bald conclusion that with "reasonable accommodation" he could have performed the "essential functions" of the jobs at issue.

request for a reasonable accommodation as a matter of law because no reasonable juror would find asking an employer to be a guarantor against situations on the job that might cause stress, is unreasonable, unrealistic, and nonspecific.[30]

The other accommodations Bertenshaw requested are equally outside the realm of what the ADA requires. Bertenshaw filed a formal "Reasonable Accommodation Request Form" on May 8, 2001 which essentially requested that the school principal follow the rules and regulations in the collective bargaining agreement (see Background, above).  A reasonable accommodation is one that is intended to remove a barrier to equal employment opportunity.  Requiring a school to follow a collective bargaining agreement simply is not what the legislature had in mind when describing a "reasonable accommodation."[31]

Given the frequency of Bertenshaw's medical leaves, particularly toward the end of the employment at LLHS, I find it necessary to pass on the issue, although it is not argued by Bertenshaw.  Every medical leave requested by Bertenshaw was granted.  Further, her requests

---

[30]   Bertenshaw mentions that Defendants requested her to ask her physician to waive these requests before they would agree to proceed with the grievance process for her April 30th grievance. The evidence bears this out, but Bertenshaw's indignance is misplaced. Juliette Castillo, Assistant Superintendent, indeed made this request of Bertenshaw by letter of May 3, 2001. Ex. 31. The request was made following Bertenshaw's physician's statement asking the school district "not to place [her] in situations of prolonged stress."  Given the nebulous nature of the accommodation, the school's request was not unreasonable. See Ex. 2 at 156 (Burnett's inquiry of Bertenshaw's physician to assess scope of possible accommodation).

[31]  The term "reasonable accommodation" may include: (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and  (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.  42 U.S.C. §12111(9).

for leave do not add any merit to her reasonable accommodation claim. In between medical leaves, Bertenshaw was gainfully employed as a teacher at LLHS, and up until the time she was found totally disabled from any occupation, she was performing the essential functions of her job as a teacher. At no time during this period did Bertenshaw make any specific request to Defendants for any accommodations which would allow her to stay on. See Cisneros v. Wilson, 226 F.3d 1113, 1131 (10th Cir. 2000) (plaintiff failed to establish that she was a qualified individual with a disability because she failed to show that her requested leave was a reasonable accommodation).

In light of the foregoing discussion, Defendants are entitled to summary judgment on Bertenshaw's ADA claim based on a failure to provide a reasonable accommodation, which will be dismissed.

## III.   Count Three - Retaliation under Title VII and the ADA[32]

For her retaliation claims under both Title VII and the ADA, Bertenshaw must show (1) that she was engaged in opposition to discrimination, or participation in such proceedings; (2) that she was subjected to adverse employment action subsequent to or contemporaneous with the protected activity; and (3) that there is a causal connection between the protected activity and the adverse employment action. Gunnell v. Utah Valley State College, 152 F.3d 1253, 1262 (10th Cir.1998); Murray v. City of Sapulpa, 45 F.3d 1417, 1420 (10th Cir.1995). For reasons given below, I find that Bertenshaw has not presented evidence sufficient to preclude summary

---

[32] The same standard is used to examine retaliation claims under Title VII and the ADA. See Pastran v. K-Mart Corp., 210 F.3d 1201 (10th Cir. 2000); Thomas v. National Ass'n of Letter Carriers, 225 F.3d 1149 (10th Cir. 2000). Therefore, references to Title VII in this section should be taken as references to retaliation under the ADA as well.

judgment.  Title VII retaliation claims are subject to the burden- shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973).  <u>McGarry v. Bd. of County Comissioners of Cty of Pitkin, State of Colo</u>.,175 F.3d 1193, 1201 (10th Cir. 1999).[33] At all times, a plaintiff retains the ultimate burden of proving that the protected actions in which she engaged were indeed the cause of any adverse action that occurred. <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981); <u>Martin v. Gingerbread House, Inc</u>., 977 F.2d 1405, 1408 (10th  Cir.1992).

Bertenshaw contends that after filing her own EEOC charge on May 25, 2001, she was retaliated against when she was removed as NEA representative, and when her Honors English classes were taken away and given to a less-qualified teacher.

A.      <u>Protected Activities</u>

Bertenshaw's filing of her EEOC charge on May 23, 2001 was clearly protected conduct. Filing an EEOC claim qualifies as protected activity." <u>Anderson v. Coors Brewing Co</u>., 181 F.3d 1171, 1178 (10th Cir.1999). Although not separately mentioned, Bertenshaw's grievance which she filed on May 16, 2001 is also protected activity under Title VII.. <u>Amir v. St. Louis University</u>, 184 F.3d 1017, 1025 (8th Cir.1999) (recognizing plaintiff's protected activity consisted of filing a grievance and a lawsuit against the university), <u>cited in</u> <u>Heiman v. United Parcel Service, Inc</u>., 2001 WL 314515 (10th Cir., (Kan.) 2001); <u>Robbins v. Jefferson County Sch. Dist. R-1</u>, 186 F.3d 1253, 1258 (10th Cir.1999) (informal complaints to superiors or the use of the employer's internal grievance procedures constitutes protected activity under Title VII), <u>cited in</u> <u>Pastran v. K-Mart</u>

---

[33]   However, use of this standard to ascertain whether a plaintiff has met this ultimate burden has recently been criticized as redundant. <u>Wells v. Colo. Dept of Transportation et al</u>, 325 F.3d 1205 (10th Cir. 2003) (J. Hartz, concurring).

<u>Corp</u>. 210 F.3d 1201 (10th Cir. 2000).

B.      <u>Adverse Actions</u>

Bertenshaw passes muster on the "protected activity" requirement, but fails to show that she suffered any adverse action as a result of filing either a grievance or an EEOC charge. The Tenth Circuit liberally defines the phrase "adverse employment action," which is generally considered to be actions adversely affect or unfavorably alter the conditions of an employee's employment. <u>Gunnell v. Utah Valley State College</u>, 152 F.3d 1253, 1264 (10th Cir.1998). Such actions are not simply limited to monetary losses in the form of wages or benefits. <u>Jeffries v. State of Kansas et al</u>.,147 F.3d 1220, 1232 (10th Cir. 1998). The Court takes "a case-by-case approach," examining the unique factors relevant to the situation at hand. <u>Id</u>.

Several of the alleged actions taken by Defendants can be summarily dealt with because they occurred prior to the time Bertenshaw filed either her grievance or EEOC charge.  <u>Anderson v. Coors Brewing Co</u>.,181 F.3d 1171, 1179 n.2 (10th Cir. 1999) ("adverse action" has to happen after the protected activity, not before). For this reason, both the January 1st Chain of Command Letter and the April 23rd Letter of Reprimand cannot be considered adverse actions.[34]

Bertenshaw's contention that she was not given the Honors English class to teach also does not fit within a time line to be considered an adverse action, based on the evidence in the record.  Bertenshaw offers no evidence to dispute the finding included in the EEOC No Cause Determination that she knew by early May 2001 that she would not be teaching Honors English, and was informed of the same in writing by May 23, 2001. Ex. T. She also does not dispute the

---

[34] Bertenshaw does not formally argue that the letters of reprimand are adverse actions in the text of her brief. However, she implies that they are adverse actions within her lengthy Statement of Material Facts.

fact that Defendants received notice of the EEOC charge she filed on June 6, 2001.  Therefore,

since the decision regarding the Honors English assignment was made prior to Bertenshaw's filing

of the EEOC charge, and well before Defendants were aware of the filing, the issue regarding the

Honors English teaching assignment cannot be considered an adverse action. Ex. T.[35]

C.      Causal Connection

        This leaves only one alleged adverse action that was taken within a time proximity close

enough to possibly constitute an adverse action.  Bertenshaw was removed as grievance

representative barely a month after engaging in protected activity. However, retaliation still

requires a showing of intent.  Purrington v. City of Utah, 996 F.2d 1025, 1033 (10th Cir. 1993)

(district court did not err in requiring plaintiff to prove intentional retaliation rather than mere

causation); Burrus v. United Tel. Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir.1982) (a

showing of retaliatory motive has long been relevant to the causation prong of a retaliation claim).

Bertenshaw believes that Henington and Burnett urged Morgan to remove her as NEA

representative. However, her sole support for this contention is Judy Garner's feeling that

Bertenshaw and Gallo (who was also removed) should have been allowed to "stay on." Ex. 4 at

45-47. Bertenshaw offers no evidence to counter Morgan's direct testimony that the two women

were removed because they essentially were not using good judgment in their role as union

representatives. Moreover, there is no evidence that Henington and Burnett had any involvement

---

        [35]  It is not clear whether the alleged retaliation based on the Honors English class was
alleged in the initial EEOC charge or in the amended charges -- nor does it matter, since the
decision about the Honors English class was decided prior to the filing of the initial charge.
Bertenshaw's only "dispute" with the Defendants' Statement of Fact on the No Cause
Determination is simply that the document should not be taken as a dispositive finding on the
merits of her claim.  However, she does not challenge the dates contained in the document
regarding her knowledge about the Honors English class assignment.

in or influenced Morgan's decision to remove Bertenshaw as NEA representative.

Lastly, I have examined the evidence submitted by Bertenshaw for the proposition that the hostility and harassment she alleges to have suffered was a form of retaliation. See Gunnell, 152 F.3d at 1264 (hostility and harassment, if sufficiently severe, may be adverse employment action for purposes of a retaliation claim). These incidences (almost all of which happened to other individuals), even when taken together, are not enough to constitute retaliation.

Therefore, Defendants are entitled to summary judgment on Bertenshaw's claims of retaliation under Title VII and the ADA.

## IV.   First Amendment (§ 1983)

Bertenshaw contends that she engaged in speech for which she was punished. To prevail on her First Amendment claim, Bertenshaw must prove that (1) her speech is protected under the First Amendment and (2) the speech was a substantial or motivating factor behind her employer's decision to take adverse action against her. Conaway v. Smith, 853 F.2d 789, 795 (10th Cir.1988), citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). If Bertenshaw meets this burden, Defendants may avoid liability by showing that they would have made the same decision in the absence of the protected activity.  Childers, 676 F.2d at 1341.  Lee v. Bd. of Cty. Commissioners of Arapahoe Cty, Colo et al., 18 F.Supp.2d 1143, 1157 (D.Col. 1998)

In a qualified immunity analysis under a First Amendment theory, the inquiry is whether speech addressed matters of public concern and if so, whether the protected nature of the speech was sufficiently clear that Defendants should have known that the school's interests would not survive a balancing inquiry.  Patrick v. Miller, 953 F.2d 1240, 1246  (10th Cir. 1992).

35

Bertenshaw alleges that the following are protected speech: her communications with Romero about curriculum issues which resulted in the Chain of Command letter, the Statement of Concern during the Columbine incident, and union representation and association.  She also contends that the Chain of Command letter requiring her to follow the appropriate chain of command set forth in the faculty handbook was a form of prior restraint on her speech.

A.     <u>Protected Speech</u>

I find that Bertenshaw has not met the initial requirements in a qualified immunity analysis because she was not engaged in speech which touched on matters of public concern.

*1.     Chain of Command Letter*

Bertenshaw views the Chain of Command letter as a reprimand carried out in retaliation for her "speaking out" to high level administrators. Her letter to Romero is not protected under the First Amendment because it did not involve, either in content or context, matters of public concern. <u>Connick v. Meyers</u>, 461 U.S. 138, 147-48 (1983) (whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record). It is not sufficient that the topic of the speech be of general interest to the public; "in addition, what is actually said must meet the public concern threshold." <u>Schalk v. Gallemore</u>, 906 F.2d 491, 495 (10th Cir.1990).

Bertenshaw's correspondence to Romero questioned Romero's decision to eliminate a tracking system. High school curriculum could be, in certain circumstances, a matter of public concern. However, it is insufficient that the speech relates generally to a subject matter of public importance. Instead, the speech must "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of the government." <u>Wilson v. City of Littleton</u>, 732 F.2d 765, 768 (10th

Cir.1984). Bertenshaw's letter to Romero was certainly not "calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties." Lancaster v. Indep. Sch. Distr. No. 5, et al.,149 F.3d 1228, 1233 (10th Cir.1998). It simply reflected differing individual opinions over whether students would benefit more from "ability grouping" for the English classes.

Henington's letter to Bertenshaw, prompted by Romero's letter to Henington, addressed Bertenshaw's failure to follow a set procedure for voicing concerns to higher administration. The First Amendment's shield does not extend to speech and conduct closely connected with insubordination "that interferes with the proper functioning of the workplace." Hankard v. Town of Avon, 126 F.3d 418, 421 (2d Cir. 1997) (citing Connick v. Myers, 461 U.S. 138, 163 n.3 (1983) (citations omitted). Thus, because Bertenshaw's speech involved internal policies, it is not protected. See Curtis v. Oklahoma City Pub. Schools Bd. of Educ., 147 F.3d 1200, 1212 (10th Cir.1998) ("Speech concerning individual personnel disputes or internal policies will typically not involve public concern").

### – *Prior Restraint*

 Unlike an adverse action taken in response to actual speech, prior restraint bans potential speech before it happens. United States v. Nat'l Treas. Employees Union, 513 U.S. 454 (1995) ("NTEU"). I do not find that Henington's January 31st letter to Bertenshaw was a prior restraint on Bertenshaw's speech. Assuming the chain of command policy set forth in the faculty handbook, see Ex. 26, to be subject to a prior restraint analysis, [36] that policy cannot be

---

[36] "Regulations which condition the exercise of speech rights on the prior permission of a government official constitute a prior restraint. Where such regulations fail to include 'narrow, objective and definite standards to guide the licensing authority,' the Supreme Court has struck

considered to prevent or chill Bertenshaw's speech.  It merely requires that she raise work-related

issues with her immediate supervisors first.

At the very least, the individual Defendants would be entitled to qualified immunity on this

narrow issue, since it was not clearly established at the relevant time that the school's chain of

command policy would constitute a prior restraint on speech. See  Arndt v. Koby, 309 F.3d 1247

(10th Cir 2002) (detective sued city for issuing gag order preventing her from speaking to media).

Further, I find that the claim fails on its merits, since the school's burden of justifying the policy

would be met. The chain of command procedure provides a systematic way of handling letters,

suggestions and reports from teachers and staff members. Thus, it serves in the interest of the

school's efficiency, from an education as well as administrative standpoint. NTEU, 513 U.S. at

468 (Government must show "that the interests of both potential audiences and a vast group of

present and future employees in a broad range of present and future expression are outweighed by

that expression's 'necessary impact on the actual operation' of the Government").

Nor do I find that the chain of command policy poses an "actual or potential danger" that

Bertenshaw's speech would be chilled.  See Worrell v. Henry, 219 F.3d 1197, 1213 (10th Cir.

2000) (no constitutional violation where "person of ordinary firmness" would not be deterred

from continuing to engage in that activity).

2.     *Columbine Statement of Concern*

In order for a public employee's speech to be of "public concern," it is not always enough

them down as facially unconstitutional." Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151
(1969). Also, the analysis still begins by looking to see whether the speech was on a matter of
public concern. Arndt v. Koby, 309 F.3d 1247 (10th Cir 2002)  I have already found that it was
not.

that its subject matter could in certain circumstances, "be the topic of a communication to the public that might be of general interest."  What is actually said on that topic must itself be of public concern. <u>Wilson v. City of Littleton</u>, 732 F.2 d 765, 769 (10th Cir. 1984) (citing <u>Connick,</u> 461 U.S. at 148 n.8). In another context, the Statement of Concern Bertenshaw distributed could possibly be considered public speech. Here, however, the letter was nothing more than Bertenshaw's dissatisfaction with how school administrators communicated about the heightened security measures in place on April 20, 2001. Contrary to Bertenshaw's description of the letter, it was not about safety. There was no indication from the form, content or context of the petition that Defendants were not responsive to the safety needs of the school, or had handled the threats to the school improperly. <u>Cmp.</u>, <u>Clinger v. N.M. Highlands Univ.</u>, 215 F.3d 1152, 1166-67 (10th Cir. 2000) ("speech that seeks to expose improper operations of the government or questions the integrity of government officials clearly concerns vital public interests"). Bertenshaw drafted the petition simply because she felt that the teachers were entitled to more information that morning, allegedly because the administration had previously agreed to do so.

3.      *Union Activities*

At the time of the underlying conduct, it was clearly established that the First Amendment protect rights of public employee to join and participate in a labor union. <u>Smith v. Arkansas State Highway Emp.</u>, 441 U.S. 463, 465 (1979). Bertenshaw includes union association in her First Amendment claim, but does not follow up with any specifics.  The Court is unclear as to which union activities are at issue,[37] and need not further scour Bertenshaw's Statement of Material

---

[37] Bertenshaw does not expressly include the filing of her grievance as an alleged protected activity.  The First Amendment prohibits retaliation against an employee who files a grievance with the union. <u>Morfin v. Albuquerque Public Schools</u>, 906 F.2d 1434, 1439 (10th Cir. 1990).

Facts for possible theories, since I also find that Bertenshaw did not suffer any adverse action at the hands of Defendants.

B.      Adverse Actions and Causal Connection

Again, the Court is left with extrapolating from Bertenshaw's Statement of Material Facts which actions she alleges as adverse for her First Amendment claim. As I mentioned previously in the discussion on Bertenshaw's Title VII / ADA claims, the April 23rd Letter of Reprimand and the Chain of Command letter cannot be considered adverse actions, since they were issued prior to any protected activity. Here, even if I were to assume that Bertenshaw's letter to Romero and the Columbine Statement of Concern were protected by the First Amendment,[38] Bertenshaw's claim is ultimately doomed because she has not suffered any adverse action. The factual chronology leaves Bertenshaw's removal as NEA representative by Morgan as the only remaining alleged adverse action that occurred after Bertenshaw filed .

In 1991, it was clearly established that actions "short of an actual or constructive employment decision can in certain circumstances violate the First Amendment." Morfin v. Albuquerque Pub. Schs., 906 F.2d 1434, 1437 n. 3 (10th Cir.1990) (emphasis added).  An action need not be "only adverse employment decisions, such as termination, suspension, or transfer," in order to be illegal under the First Amendment.  Id.; Schuler v. City of Boulder, 189 F.3d 1304, 1309-10 (10th Cir.1999) (holding that employers' acts short of dismissal may be actionable as

_____

However, even allowing Bertenshaw an undeserved liberal construction of her claim (she is represented by counsel), my conclusion below that Bertenshaw did not suffer any adverse action moots this argument.

[38]  This hypothetical also assumes that Bertenshaw alleged that filing a grievance with her union was protected under the First Amendment's right of association with a union.

First Amendment violations). At the same time, not all "minor adverse actions" support a retaliation claim, nor was it clearly established at the time that trivial actions were sufficiently adverse for First Amendment purposes. Lybrook v. The Members of the Farmington Municipal Schools Board of Education, 232 F.3d 1334, 1339-40 (10th Cir. 2000); Colson v. Grohman, 174 F.3d 498, 511 (5th Cir.1999) (finding that Schuler left open the possibility that "there may be some minor adverse actions that would not constitute First Amendment violations").

I find that Morgan's decision removing Bertenshaw as NEA representative is an example of the kind of action envisioned by Lybrook, which are actions taken short of dismissal, but not substantial enough to constitute an adverse action under the First Amendment.  Rutan v. Republican Party,  497 U.S. 62, 75 (1990) (claimed adverse employment action must  relate to a significant aspect of the employment relationship). The bigger problem with this action is that, as discussed earlier, Bertenshaw has not shown any connection whatsoever between her removal as grievance representative and either Henington or Burnett.  See Hom v. Squires et al, 81 F.3d 969 (10th Cir. 1996) (plaintiff's protected speech voicing concerns about illegal bidding process had no causal connection to allegedly adverse action); Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir.1994) (plaintiff must show that he suffered adverse employment action and that there is a causal connection between the protected speech and the adverse action).

With regard to Bertenshaw's First Amendment claims, Defendants are entitled to summary judgment.

## V.      Count Five - Fourteenth Amendment Due Process (§ 1983)

Bertenshaw alleges that both her substantive and procedural due process rights were violated. "The Due Process Clause not only provides a procedural safeguard against deprivations

41

of life, liberty, and property but also protects substantive aspects of those interests from

unconstitutional restrictions by government." Harris v. Blake, 798 F.2d 419, 424 (10th

Cir.1986).[39] Neither of these claims have merit.

A.      Substantive Due Process

Bertenshaw bases her substantive due process claim on an assertion of a right to continued

employment, premised on constructive discharge. To prevail on this claim, Bertenshaw must first

allege a right entitled to substantive due process protection, and then present evidence such that a

reasonable juror could find that Defendants' actions toward her were either arbitrary or

capricious, without a rational basis, or in a manner shocking to the conscience. Brenna v.

Southern Colo. State College, 589 F.2d 475, 476 (10th Cir 1978); Curtis v. Oklahoma City Pub.

Sch. Bd. of Educ., 147 F.3d 1200, 1215 (10th Cir.1998).  Because Defendants have asserted the

qualified immunity defense, Bertenshaw must also show that the constitutional right was clearly

established at the time such that a reasonable person in Defendants' position would have known

that the alleged conduct violated that right." Butler v. City of Prairie City, Kan., 172 F.3d 736,

744 (10th Cir. 1999).

Bertenshaw's substantive due process claim must fail because there is no clearly

established law which accords the protections of substantive due process to employment, except

---

[39]  In procedural due process claims, the deprivation by state action of a constitutionally
protected interest in "life, liberty, or property" is not in itself unconstitutional; what is
unconstitutional is the deprivation of such an interest without due process of law. Parratt v.
Taylor, 451 U.S. 527, 537 (1981). Finding that there is a substantive due process right means the
right is protected against a government actions regardless of the procedure provided. Collins v.
City of Harker Heights, 503 U.S. 115, 125 (1992).

perhaps for tenured employees.[40] See Tonkavich v. Kansas Bd. of Regents, 159 F.3d 504, 528

(10th Cir. 1998) (tenured employee possessed a property interest deserving of substantive

protections of the Fourteenth Amendment);Garcia v. City of Albuquerque, 232 F.3d 760, 771

(10th Cir. 2000) (bus driver with tenure). There is no evidence that Bertenshaw was a tenured

teacher, which would provide Bertenshaw with the beginnings of a viable claim. See Bailey v.

Kirk, 777 F.2d 567, 579 (10th Cir.1985) (an employee's constructive discharge from a position in

which the employee has a protectable property interest may be actionable under §42 U.S.C.

1983).  However, even tenure would not save Bertenshaw's claim, since Defendants did not take

any action to deprive her of the right to continued employment -- Bertenshaw left employment

when she retired.

Constructive discharge exists when a reasonable person would view the working

conditions as intolerable and when the working conditions are so difficult "that a reasonable

person in the employee's position would feel compelled to resign." Derr v. Gulf Oil Corp., 796

F.2d 340, 344 (10th Cir.1986) (applying constructive discharge in a Title VII case) (citation

omitted).  As I have determined earlier in this Memorandum Opinion, no reasonable juror could

conclude that Bertenshaw  was "compelled to resign" due to intolerable work conditions. The bar

in the Tenth Circuit is quite high in constructive discharge cases: a plaintiff must show he or she

had no other choice but to quit. Sanchez v. Denver Public Schools, 164 F.3d 527, 534 (10th

---

[40] See Hennigh v. City of Shawnee, 155 F.3d 1249, 1257 (10th Cir. 1998)(circuit
precedent does not clearly delineate what specific property interests in employment are
fundamental, and thus protected by the doctrine of substantive due process); Curtis v. Oklahoma
City Public Schools Bd., 147 F. 3d 1200, 1215, n.7 (10th Cir. 1998); Archuleta v. Colorado Dept.
of Institutions, 936 F2d 483, 489, n. 6 (10th Cir. 1991) (assuming, without holding, that the
plaintiff's property interest would be entitled to the protection of substantive due process).

Cir.1998). Bertenshaw has not made the required showing for constructive discharge.

B.       Procedural Due Process

Bertenshaw describes her allegations of procedural due process violations by stating that they are "too numerous to recount" and that she was precluded from listing them in her brief because of the "page limitations imposed by the Court."  Those Bertenshaw managed to fit into the thirty-page brief are included in a footnote (number 23).  Bertenshaw essentially asserts that she was "prejudged" without due process in receiving the Chain of Command letter, the April 23rd Letter of Reprimand, and the refusal of Henington to accommodate her medical condition without a hearing. The Court is grateful for the page limitation if these are the most egregious examples of denials of due process Bertenshaw can offer.

If state statutes or regulations place substantive restrictions on a government actor's ability to make personnel decisions, then the employee has a protected property interest. See Campbell v. Mercer, 926 F.2d 990, 993 (10th Cir.1991). None of the enumerated incidences violated her procedural due process rights, because Defendants' actions did not invade any recognized property interest. In other words, neither the United States Constitution, nor any state statute or regulation, entitled Bertenshaw to hearings prior to any of the actions taken by Defendants. Thus, Defendants did not deprive her of any process to which she was entitled.  See Snyder v. Murray City Corp, 159 F.3d 1227 (10th Cir. 1998) (process is due only when the government terminates a protected interest).

The same can be said for other half-formed allegations of denial of due process which float through Bertenshaw's pleading: (1) that she was never shown the documents for which being

"disciplined";[41] (2) never provided names of those who "accused" her; (3) that she was not

allowed to "answer back" Ex. C at 104: 15-25; (4) that Burnett played favorites and supported

any disciplinary action Romero took; (5) that the school board supported Burnett's decisions,

"right or wrong."  Bertenshaw may have legitimate gripes with how the LLPS are run, but these

cannot be redressed under the federal constitution. Similarly, Bertenshaw's objection to the lack

of information during the Columbine incident is not cognizable under a federal due process

theory, even if there had been some kind of agreement with the teachers in place.  A failure to

comply with state or local procedural requirements "does not necessarily constitute a denial of

due process; the alleged violation must result in a procedure which itself falls short of standards

derived from the Due Process Clause." Mangels v. Pena, 789 F.2d 836, 838 (10th Cir.1986)).

If Bertenshaw was a tenured employee (an issue not argued by either party), she would be

entitled to certain procedural due process. Gilbert v Homar, 520 U.S. 924, 928-29 (1997) (public

employees who can be discharged only for cause have a constitutionally protected property

interest in their tenure, and cannot be fired without due process); Hennigh v. City of Shawnee,

155 F.3d 1249, 1253 (10th Cir. 1998) (if statute, regulation or policy  restricts reaosns for

discharge to "just cause shown," then employee has right to continued employment until such

grounds or causes are shown). However, as determined above, Bertenshaw's voluntary departure

from LLHS precludes a claim that Defendants denied her due process. Pitts v. Bd. of Educ

U.S.D. 305, Salina, Kansas, 869 F.2d 555, at 557 (10th Cir. 1989) (failure of plaintiff to permit

defendants to provide due process by resigning eliminates the claim).

---

[41]  The Court does not grasp the importance of getting copies of documents that
Bertenshaw herself generated, e.g., her letter to Romero and the Statement of Concern, which she
drafted on her computer.

C.      Liberty Interests

Bertenshaw does not respond to Defendants' arguments on her alleged denial of liberty

interest. To state a claim founded on a liberty interest, an employee must show "that a public

employer took action to terminate an employee based upon a public statement of unfounded

charges of dishonesty or immorality that might seriously damage the employee's standing or

associations in the community and foreclose the employee's freedom to take advantage of future

employment opportunities" Melton v. City of Oklahoma City, 928 F.2d 920, 927 (10th Cir.1991).

Bertenshaw was not terminated. There are no charges, unfounded or otherwise, of dishonesty or

immorality alleged. There is no evidence that Bertenshaw's future employment is limited by

anything other than her disability.  Defendants are granted summary judgment on Bertenshaw's

liberty interest claim.

## VI.     Count Six - Fourteenth Amendment Equal Protection (§ 1983)

In this last claim, Bertenshaw makes several allegations that she was treated less favorably

than males. In order to prevail on her Equal Protection claim, Bertenshaw must show that

Defendants treated her differently than others "similarly situated" and that this different treatment

lacked a rational basis. Landmark Land Co. of Oklahoma v. Buchanan, 874 F.2d 717, 722 (10th

Cir.1989). On page 18 of her Response, Bertenshaw lists nine instances which she believes

demonstrates that Henington and Burnett favored men. Of these nine, only one pertains to her,

i.e., the "Doc Clary" incident.  Henington's alleged failure to discipline Clary, or to further

investigate the incident ("you asked for it") does not constitute evidence on which to base an

equal protection claim because Bertenshaw has failed to show how she and Doc Clary are

similarly situated.

Bertenshaw has no standing to bring any of the other incidents as § 1983 claims because such claims must be based upon the violation of her own rights, and not the rights of someone else. Dohaish v. Tooley, 670 F.2d 934, 936 (10th Cir. 1982), cert. den. 459 U.S. 826 (1982).[42] Defendants are thus entitled to summary judgment on Bertenshaw's equal protection claims.

## VII.   Claims Against School Board and Los Lunas Public Schools

### A.  School Board

In her § 1983 claims, Bertenshaw makes generic assertions against all Defendants. However, as government entities, neither the LLPS nor the Los Lunas School Board ("Board") can be held liable for the actions of its employees under a theory of respondeat superior.  Monell v. Department of Social Services, 436 U.S. 658, 691 (1978). Instead, it must be shown that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action. Pembaur v. City of Cincinnati, 475 U.S. 469, 480-83 (1986) (plurality opinion); Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2000).

Defendants contend, and I agree, that the Board should be dismissed. Bertenshaw makes almost no specific allegations that involve the Board or Board members. Based on my discussion above, Defendants are entitled to summary judgment on all of Bertenshaw's § 1983 claims, which eliminates the possibility of the Board's liability. See Apodaca v. Rio Arriba County Sheriff's Dept., 905 F.2d 1445, 1447 (10th Cir. 1990) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (A municipality may not be held liable where there is no underlying constitutional

---

[42]  Many of these incidents which happened to other female teachers are the same as those included in the discussion on Bertenshaw's Title VII hostile environment claims.

violation by any of its officers).

B. <u>Los Lunas Public Schools</u>

Based on the above findings, dismissal of the LLPS is appropriate. Since LLPS is a governmental entity which cannot be held liable under a theory of respondeat superior, my conclusion that the individual Defendants did not violate any of Bertenshaw's constitutional rights under § 1983 warrants the dismissal of LLPS because no underlying constitutional violations exist. Similarly, because Bertenshaw Title VII claim is alleged against the employer, my determination that Bertenshaw's Title VII claim is without merit requires the dismissal of LLPS, as well as the School Board.

## CONCLUSION

The Defendants' Revised Motion for Summary Judgment on Bertenshaw's Corrected First Amended Complaint **(Doc. 296)** is hereby GRANTED on all of Bertenshaw's claims against all Defendants, for the reasons stated in this Memorandum Opinion.

**IT IS SO ORDERED.**

_____

UNITED STATES DISTRICT JUDGE